## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

NINO NATHANIEL ORTEGA,

       Plaintiff,

v.                                          Civ. No. 12-CV-0501 MV/RHS

SAN JUAN COAL COMPANY, a Delaware
Corporation,

       Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant San Juan Coal Company's ("Defendant") Motion for Summary Judgment and Supporting Brief, filed February 21, 2013 (Doc. 27) ("Motion for Summary Judgment").  The Court, having considered the motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion for Summary Judgment is not well taken and will be denied.

### BACKGROUND

I.    <u>Procedural Background</u>.

On May 10, 2012, the plaintiff Nino Nathaniel Ortega ("Plaintiff") filed a Complaint for Violations of the Family and Medical Leave Act of 1993 ("FMLA") (Doc. 1), 29 U.S.C. § 2601 *et seq.*, alleging that the Court exercises federal question jurisdiction over the Complaint pursuant to 28 U.S.C. Section 1331, and asserting that the Defendant violated the FMLA when it failed to approve his request for leave and terminated his employment.  On July 18, 2012, the Plaintiff filed his First Amended Complaint for Violations of the Family and Medical Leave Act of 1993 (Doc. 9) ("Amended Complaint").  The Defendant filed its Motion for Summary Judgment on

February 21, 2013, seeking judgment as a matter of law in its favor on the FMLA claims.

II.      Factual Background.[1]

The Plaintiff was employed by the Defendant for a period of nine years.   *See* Am. Compl. ¶ 7.   On March 7, 2009, the Plaintiff suffered a workplace back injury, for which he underwent surgery on September 28, 2009.   *See id.* ¶¶ 8, 9; Resp. to Mot. for Summ. J. ("Resp."), Exh. 1, Arbitration Transcript ("Tr.") at 303:4 (Ortega).   The surgery prevented the Plaintiff from working until June 20, 2010.   *See id.*; Am. Comp. ¶¶ 8, 9.   When the Plaintiff returned to work on June 21, 2010, he was suffering from "severe migraines and numbness down [his] arms into [his] hands and pain in [his] neck area."   Tr. at 304:10-11 (Ortega).

On June 15, 2010, the Plaintiff and the Defendant entered into the Transitional Duty Agreement ("TDA"), to become effective June 21, 2010, which assigned the Plaintiff to work in the Safety Department, *see* Mot. for Summ. J., Exh. 4, performing routine clerical work in Dawn Villallobos's office, *see* Tr. at 304:1-5 (Ortega).   The TDA provided that the Plaintiff's work schedule would be "flexible, 4 hrs per day" and that "[s]chedule changes are to be discussed with Robin Irwin."   *Id.*   The TDA identified Robin Irwin as "Supervisor."   Mot. for Summ. J. Exh. 4. On June 30, 2010, the parties modified the TDA ("Modified TDA") to increase the number of hours the Plaintiff could work each day to four to six hours per day.   *See* Mot. for Summ. J., Exh. 5.   Both the TDA and Modified TDA provide that the "[e]mployee is limited to [the prescribed] hrs per day as tolerated."   Mot. for Summ. J., Exhs. 4, 5.   These limitations were determined based upon recommendations provided by the Plaintiff's physician.   *See* Tr. at 88:21-25, 89:1-16 (Jones); Resp., Exh. 4.   The TDA and Modified TDA did not release the Plaintiff from the

---

[1]   Except where otherwise noted, the following facts are undisputed or construed in the light most favorable to the Plaintiff.

requirements set forth in the Defendant's policy regarding attendance ("Attendance Policy").   *See* Mot. for Summ. J., Exhs. 4, 5.

The Collective Bargaining Agreement between the Defendant and the International Union of Operating Engineers, Local 953 ("Union") incorporates the Defendant's Attendance Policy. *See* Mot. for Summ. J., Exh. 3, Agr. Between San Juan Coal Co. and Int'l Union of Operating Engineers, Local 953, dated May 1, 2006 to Apr. 30, 2011, San Juan Underground Mine ("CBA"), at 4.   The Attendance Policy provides in relevant part that "[a]bsences or tardies should be arranged with the employees' immediate supervisor as soon as possible," and that "[a]n employee is considered to have an unexcused absence if they fail to prearrange their absence."   Mot. for Summ. J., Exh. 3, Attendance Policy §§ I.C, D.   The Attendance Policy defines "prearranged" "as a minimum of ten (10) hours before the beginning of an employee's scheduled shift."   *Id.* § I. The policy further provides that "[u]nexcused absences can be changed to excused absences upon presentation of adequate evidence by the employee . . . to justify the claim.   This evidence should include the reason for the absence and the reason for not prearranging it.   The supervisor will make the decision on whether the absence is excused or unexcused.   This provision is subject to the Grievance Procedure."   *Id.* § I.F.

The Attendance Policy also instructs employees how to report an absence or tardy.   The policy provides that the employee "should contact the Company utilizing the *Call-In Procedure*." *Id.* § II.A.   The policy further indicates, "If you are unable to reach your supervisor call the 24-hour message service to report off.   You should state that you are calling to report off work and then answer the questions asked of you.   After the information has been taken you will be given a confirmation number, which you should keep . . . .   Your supervisor will later determine whether your absence is excused."   *Id.* § II.B.

In addition, the policy informs employees of the disciplinary action for unexcused absences, and provides, "Employees who do not report off work and/or are absent three (3) consecutive unexcused days will be presumed to have terminated their employment with the Company."  *Id.* § III.A.1.   Furthermore, "Employees who fail to report off work and/or accumulate a total of three (3) days of unexcused absences during a six (6) month period shall be presumed to have terminated their employment with the Company."  *Id.* § III.A.2.   The policy provides:   "First day unexcused absence—Verbal Warning"; "Second unexcused day absence—Written Warning"; and "Third day unexcused absence—Termination."  *Id.*   With respect to the aforementioned discipline, the policy provides, "It is also recognized that in certain instances it may be impossible for an employee to report off.   The employee will have the right to request reinstatement to their job through the grievance procedure as set forth in the labor agreement, and upon proof of the causes which prevented their calling in."  *Id.* § III.A.3.

The Plaintiff's migraine headaches caused the Plaintiff to miss work on June 23, 2010, June 28, 2010, June 30, 2010, July 2, 2010, July 15, 2010, July 16, 2010, and July 20, 2010.  *See* Resp., Exh. 1, at 309:1-7 (Ortega).   With respect to the three absences in June 2010, and the absences on July 2 and 15, 2010, the Plaintiff either notified Irwin on the day of the absence or on the following day that the Plaintiff would not be at work, and the Defendant considered the absences "excused."  *See id.* at 310:5, 311:12-13, 312:10, 14-20 (Ortega).

On July 13, 2010, the Plaintiff's physicians changed his migraine medications, and the Plaintiff's neurologist indicated that the new medications "had potentially severe side effects, including weight loss, diarrhea, an increase in the migraines, or inability to walk because the medications could cause the patient to become unbalanced."  Mot. for Summ. J., Exh. 1, Arbitration Op. & Award ("Arbitration Op.") at 15.   The Plaintiff started the new medications on

4

July 14, 2010, and late in the evening on the 14th or early in the morning on 15th, the Plaintiff developed what he described as "a severe, debilitating migraine." *Id.* The Plaintiff testified, "I was unable to basically do anything. At that point in time, I—I was unaware of my surroundings and I was very debilitated." Tr. at 320:13-23 (Ortega).[2]

It is undisputed that the Plaintiff did not report for work on July 15 or 16, 2010, and did not notify the Defendant or call the 24-hour message service before or on the day of either absence. *See* Resp. at 5. It also is undisputed that the Plaintiff reported to work on July 19, 2010, that he stayed at work two hours, and that Irwin was not on site that day. *See* Tr. at 304:1-5 (Ortega). During that two-hour period on July 19, 2010, the Plaintiff informed Dawn Villallobos and Jim Grant of his need to take FMLA leave on July 15 and 16, 2010. *See* Tr. at 323:11-21, 324:7-13 (Ortega) ("I explained to [Dawn Villallobos, the person's office in which he had been assigned to work, and Jim Grant, a management employee,] that I had my medication changed the week prior, and that I was physically unable to come to work"). The Plaintiff left work on July 19, 2010, after two hours because of a migraine headache. *See* Arbitration Op. at 17. Prior to leaving, the Plaintiff informed Villallobos and Grant that he would be leaving. *See id.* Villallobos thereafter notified Irwin of the Plaintiff's condition, and Irwin excused the Plaintiff's absence for the remainder of July 19, 2010. *See id.*

It also is undisputed that the Plaintiff did not report for work on July 20, 2010. Although the Defendant contends that the Plaintiff did not contact his supervisor—whom the Defendant

---

[2]   The Defendant contends that \ evidence of the severity or cause of the Plaintiff's migraines is not relevant to whether the Plaintiff complied with the Attendance Policy or whether the Defendant violated the FMLA. The Court disagrees. The question of the severity of the Plaintiff's physical condition is relevant to the question whether the Plaintiff complied with both the notice provisions of 29 C.F.R. Section 825.303 and Section III.A.3 of the attendance policy. *See infra* § IV.

identifies as Robin Irwin—or call the 24-hour message service, *see* Mot. for Summ. J., Exh. 9, Documentation of Unplanned Absence or Tardy, dated July 20, 2010; Tr. at 324:14-17 (Ortega), the Plaintiff maintains that on July 20, 2010, he sent a text message to the Defendant's management employee Jim Grant, stating that the Plaintiff would not be reporting for work that day.  *See id.*  The Plaintiff testified that he sent a text message to Grant because Irwin was out of town and the Plaintiff "knew Jim was at the office."  *Id.* at 325:3-6 (Ortega).  The Plaintiff further testified, "[Grant] told me okay.  I hope you feel better, buddy.  Do not drive while you—you know, under this condition."  *Id.*  When asked, "It's important in the workplace for the person who is supervising the workplace at the workplace to know if an employee is not going to be working on a given day, isn't it," *id.* at 88:11-14 (Youtz), the Defendant's General Manager James Scott Jones answered, "Correct."  *Id.* at 88:11-15 (Jones).  Jones also answered, "Correct," *id.* at 88:20 (Jones), to the question, "And the point of the call-in procedure is to make sure the supervisor who is conducting operations knows who is going to be working and who is not going to be working, correct?"  *Id.* at 88:16-19 (Youtz).

A dispute of fact exists with respect to who was the Plaintiff's supervisor.  The Defendant points to a grievance filed by the Union on behalf of the Plaintiff in which the Union refers to Robin Irwin as the "assigned supervisor."  *Id.*, Exh. 2.  The TDA and Modified TDA also list Robin Irwin as "Supervisor."  *Id.*, Exhs. 4, 5.  The Plaintiff, however, points to the testimony of General Manager Jones that the work of the Plaintiff was directed by Dawn Villallobos and Rosalin King.  *See* Tr. at 88:21-25, 89:1-16 (Jones).  The Plaintiff also testified that he was assigned to work in Villallobos' office and that she would direct his work on a day-to-day basis.  *See* Tr. at 304:1-5, 323:1-10 (Ortega).  The Plaintiff additionally argues that the evidence shows that he reported to Jim Grant, but the testimony of Jones, to which the Plaintiff points to support

6

this claim, demonstrates only that Grant was a salaried member of management, that Grant worked in the Safety Department, and that Grant signed employee time cards.   *See* Tr. at 91:1-23 (Jones). A June 15, 2010, letter from David Hales, Robin Irwin's supervisor, to the Plaintiff, indicates that the Plaintiff "[w]ill be temporarily assigned to Robin Irwin and will receive task instruction from Rosalin King and/or Dawn Villallobos."   Resp., Exh. 2; Arbitration Op. at 12.   A work schedule for the Plaintiff during the relevant time indicates that the Plaintiff's "[s]upervisor" was Joseph Yazzie.   *See* Resp., Exh. 3, Work Schedule.

A dispute of fact also exists with respect to whether Grant had the authority to excuse the Plaintiff from work.   The Defendant points to the testimony of General Manager Jones, which indicates that Grant did not have the authority to excuse the Plaintiff from work.   *See* Tr. at 37:1-3 (Jones).   Management personnel other than Irwin, however, excused the Plaintiff's absences. Specifically, on July 19, 2010, the day before the Plaintiff was fired, Irwin testified that the Plaintiff informed Villallobos that he had to leave work due to his migraine headache, and that although Villallobos was not a supervisor, the absence was excused by Irwin.   *See* Tr. at 137:9-25 (Irwin).   Irwin explained that he excused the absence because Villallobos "relayed that message to me, and I approved."   Tr. at 137:25 (Irwin).   Irwin also indicated that the Defendant's call-in procedures are not an issue when an employee is already at work.   Arbitration Op. at 17.

The Plaintiff presents evidence that the Defendant did not always apply the attendance Policy's discipline procedures as written and the Defendant did not terminate other employees who violated the Attendance Policy by failing to perform work on a given day without being excused.   For example, Mike Harjala, a steward of the Union, testified that Dean Atencio was absent four days in a row, June 8, 2006 to June 11, 2006, and the Defendant terminated Atencio on August 10, 2006, and reinstated Atencio the next day on a "last chance agreement."   *See* Resp.,

Exh. 1, at 258:1-5 (Harjala).  Virgil Kimbell was unexcused three days in a six-month period but was not terminated.  *See id.* at 259:17-24 (Harjala).  Shane Manzanares was unexcused three days in a six-month period but was not terminated.  *See id.* at 261:1-9 (Harjala).  Dedra Allison was unexcused 20 days within a six-month period and is still gainfully employed.  *See id.* at 264:22-25, 265:1-5 (Harjala).  Blaine Allison was unexcused four days in a six-month period but is still employed.  *See id.* at 265:6-12 (Harjala).  Florence Flores also was unexcused four days within a six-month period and was not terminated.  *See id.* at 265:13-18 (Harjala).

Furthermore, the Plaintiff also presented evidence that the Defendant did not follow the call-in procedures as written.  Union steward Harjala testified that Lionel Jim missed two days of work without calling in and upon his return he stated he was "stuck in the mud at his dead wife's grave, and that was sufficient to excuse him without any further authenticity given for his absence."  *Id.* at 297:13-18 (Harjala).  Stephanie Jim has not shown up to work due to, "quote unquote, female issues or problems, and upon return to work, with that substantiation, she was excused."  *Id.* at 297:24-25, 298:1-6 (Harjala).  Seth Cain, a Safety Department employee supervised by Irwin, did not call in for two days in a row, and Cain's explanation that he was snowed in and could not call in was readily accepted by the Defendant.  *See id.* at 294:20-25, 295:1-11 (Harjala).  Irwin Benally, who scheduled a vacation but did not have enough time for the last two days and did not call in or report to work on those last two days, received only a verbal warning.  *See id.*at 205:5-13 (Harjala).

Shift Superintendent Jean Paul LaBossiere and Chuck Colebrook held a fact-finding meeting with the Plaintiff on July 21, 2010, to discuss the Plaintiff's absences on July 15, 16, and 20, 2010.  *See* Arbitration Op., at 13; Tr. at 144:12-25 (LaBossiere).  Union stewards Mike Harjala and Craig Watson were present at the meeting.  *See id.* at 145:5-6 (LaBossiere).

8

LaBossiere explained that the Defendant generally holds a fact-finding meeting when an employee

gets written up to determine

> if there is any other evidence or things that may be out there that we didn't—either
> the front-line supervisor didn't ask, or they didn't bring at that time, or a lot of time
> when people call in to work, we given them an unexcused absence if they need to
> bring in doctor's notes or whatever, and we will have a fact-finding when they
> come back to work.   That's their opportunity to present that information to us, so
> that we can make our decision—our final decisions on things of that nature.

*Id.* at 145:19-25, 146:1-4 (LaBossiere).

On July 27, 2010, the Defendant issued the Plaintiff a notice of termination.   The reason

for the termination was stated as "Failure to Report Off Work on 7-1-10, 7-16-10, 7-20-10, &

7-21-10."   Mot. for Summ. J., Exh. 11.

On August 4, 2012, the Union filed a grievance on behalf of the Plaintiff, arguing that the

Defendant violated the Attendance Policy because it should have changed the Plaintiff's

unexcused absences to "excused," Mot. for Summ. J., Exh. 2, Grievance ("Grievance") at 2,

pursuant to the provision of the Attendance Policy that provides that "[u]nexcused absences can be

changed to excused absences upon presentation of adequate evidence by the employee and/or their

steward to justify the claim," Attendance Policy § I.F; *see* Grievance at 2 (citing Attendance Policy

§ IF).   The Union also argued in the grievance that the Defendant "violated the FMLA by failing

to recognize these absences as qualified FMLA protected events (migraine headaches)" and that

the Defendant "failed to verify with the grievant within 5 days after the qualifying event that this

was qualified FMLA events thereby ensuring these events are FMLA protected."   *Id*.   The

grievance proceeded to arbitration and an arbitration hearing was held pursuant to the CBA in

Farmington, New Mexico, on August 17, 2011.   *See* Arbitration Op. at 1.   The arbitration

hearing included presentation of evidence by both parties and post-hearing briefs filed by both

parties.  *See id.* at 3.

During the arbitration hearing, the Union argued that the events that prevented the Plaintiff from attending work on July 15, 16, and 20, 2010, and from complying with the call-in policy, were FMLA qualifying events and that the Defendant was prohibited from terminating the Plaintiff for those absences.  *See* Tr. at 34:21-25, 35:1-14 (Youtz).  The arbitrator stated, however, "I think that the board needs to be the one who decides whether something violates a statute."  Tr. at 36:1-3 (arbitrator).  The Union's post-arbitration brief did not make any argument regarding the FMLA, but instead focused on the issue stipulated to be before the arbitrator:  Whether the Defendant had just cause under the CBA to terminate the Plaintiff's employment.  *See* Resp., Exh. 5, Union's Post-Arbitration Br.; Arbitration Op. at 3.  The CBA provides, "The Arbitrator shall be bound strictly by the terms and provisions of this Agreement, and shall have no power to modify, amend or add to the Agreement."  Mot. for Summ. J., Exh. 3, CBA, at 18.

The Union presented evidence before the arbitrator that the Plaintiff was unable to call in his absences on July 15 and 16, 2010, because his phone was disconnected on July 13, 2010, and because he had a debilitating migraine headache that prevented him from calling in.  *See* Arbitration Op. at 13.  The Plaintiff testified that his migraine began in the early morning hours of July 15 and lasted until July 19.  *See id.*  The Plaintiff also testified that he suffered from side effects from the migraine medication during this time frame.  *See id.*  Union Steward Mike Harjala, who also attended the fact-finding meeting on July 21, 2010, testified that the Plaintiff informed them at the meeting that he did not call in his absences because he was physically unable to "walk, talk," "make phone calls," or "do anything," and because his cell phone had been turned off.  *Id.* at 14 (quoting Tr. at 211-12 (Harjala)).  After the hearing, both parties submitted

10

post-hearing arbitration briefs.  *See id.* at 3.

The arbitrator issued his Arbitration Opinion on December 21, 2011.  *See* Arbitration Op. at 1.  The arbitrator found that the Plaintiff "was fully aware of the [Defendant's] attendance policy, including the call-in procedure."  *Id.* at 10.  The arbitrator further found, "It is not disputed that [the Plaintiff] did not contact Mr. Irwin to report that he could not come to work on July 15, 16, 20, or 21."  *Id.* at 10.  With respect to the July 15 and 16, 2010 absences, the arbitrator found that the Plaintiff's excuse that he could not call in because his cell phone had been disconnected was not credible because the Plaintiff failed to provide any documentation of this claim.  *See id.* at 15.  The arbitrator also found that the evidence relating to the Plaintiff's migraines and whether the Plaintiff was physically incapable of calling in his absences on July 15 and 16, 2010, was "inconsistent and unreliable."  *Id.*  The arbitrator recognized that the Plaintiff had testified that he could not call in because he was completely incapacitated due to the migraines, *see id.*, but determined that the Plaintiff's "statements that he was totally incapacitated during that time are not supported by any documentary evidence," such as evidence that he had telephoned one of his doctors to discuss his severe symptoms.  *Id.* at 20-21.  The arbitrator reasoned that on every occasion prior to July 15, 2010, the Plaintiff contacted Irwin to prearrange his absence or advise Irwin of the absence.  *See id.* at 13, 21.  The arbitrator also discounted Harjala's testimony that the Plaintiff had informed them at the July 21, 2010, fact-finding meeting that he was incapacitated and both unable to work and unable to call in, because Harjala gave more emphasis to the Plaintiff's excuse that his cell phone had been turned off.  *See id.* at 15.

The arbitrator concluded that the Plaintiff's supervisors did not act unreasonably when they charged him with unexcused absences for July 15 and 16, 2010.  *See id.* at 16.  The arbitrator explained that Irwin had been flexible in applying the Attendance Policy, and on each

11

occasion when the Plaintiff called in to report an absence with less than ten hours of notice, and on one occasion when the Plaintiff provided an acceptable explanation the following day, Irwin excused the absences. *See id.* The arbitrator determined that "[i]t was only when Grievant did not make any effort to report off that Mr. Irwin concluded the absences should not be excused." *Id.* Further, with respect to the Plaintiff's July 20, 2010, absence and text message to Grant to inform him of the absence, the arbitrator concluded that Grant was not the Plaintiff's supervisor, and therefore it was not unreasonable for Irwin to charge the Plaintiff with an unexcused absence that day. *See id.* at 17.

The arbitrator determined that the Plaintiff was not "entitled to protection under the FMLA for the four absences in question. Neither the TDA nor [the Plaintiff's] earlier requests or contacts with Mr. Irwin contain any information or other indication that would trigger an obligation on the part of the [Defendant] to inquire as to whether the absences were protected under the [FMLA.]" *Id.* at 11. The arbitrator further concluded that the Defendant "had valid reasons for charging [the Plaintiff] with unexcused absences on July 15, 16, and 20," and that the

> evidence is not sufficient to establish that the [Defendant] was improperly or otherwise unlawfully motivated when it applied the attendance policy as it did and terminated [the Plaintiff.] The policy is specific as to the penalty for each unexcused absence, calling for termination upon the third day of unexcused absence in a six-month period. Because the policy permits challenges to determinations that absences are excused there is no separate basis for requiring the [Defendant] to delay action on a third unexcused absence pending progressive discipline for prior absences. Accordingly, the . . . grievance is denied.

*Id.* at 21.

The Union did not seek judicial review of the arbitration decision.

12

**STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id*. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted).  The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case."  *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).  The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (citation omitted).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be

13

drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).   If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.  *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## DISCUSSION

The Defendant argues that the Court should grant summary judgment in its favor on the Plaintiff's FMLA claim, because the Plaintiff's claim is barred by the doctrine of res judicata. Alternatively, the Defendant maintains that the Court should give the arbitrator's conclusion that the Defendant did not violate the FMLA great weight.  The Defendant also contends that the doctrine of collateral estoppel bars relitigation of the issue whether the Plaintiff violated the Defendant's Attendance Policy.  In addition, the Defendant argues that the arbitrator's finding that the Plaintiff violated the Attendance Policy necessarily requires dismissal of the Plaintiff's FMLA claim, because the FMLA notice provisions governing unforeseen leave set forth in 29 C.F.R. Section 825.303 provide that notice is inadequate when an employee violates the employer's internal policies.  The Defendant further advances the argument that the Plaintiff's FMLA claim must fail on the merits because the Defendant terminated the Plaintiff's employment for violating its Attendance Policy, which constitutes a reason unrelated the Plaintiff's request for FMLA leave.   The Court will address each of these arguments in turn.

## I.    THE DOCTRINE OF RES JUDICATA DOES NOT BAR THE PLAINTIFF'S CLAIMS.

The Defendant contends that the doctrine of res judicata precludes the Plaintiff's FMLA claim because the arbitrator decided the identical issue of whether the Plaintiff's termination violated the FMLA and concluded that no FMLA violation occurred.   *See* Mot. for Summ. J. at 11

14

("the arbitrator has already decided [that the Defendant's] termination of Plaintiff did not violate the FMLA, and Plaintiff should be precluded from arguing that . . . his non-compliance [with the Attendance Policy] is excused" by the FMLA).[3]   In response, the Plaintiff points to the arbitration language in the CBA indicating that "[t]he Arbitrator shall be bound strictly by the terms and provisions of this Agreement, and shall have no power to modify, amend or add to the Agreement."   Mot. for Summ. J., Exh. 3, CBA, at 18, and suggests that the arbitrator did not have the authority under the collective bargaining agreement to resolve matters involving the FMLA. *See* Resp. at 22.   Thus, the Plaintiff contends that the doctrine of preclusion cannot bar the Plaintiff's assertion of his statutory rights.   *See id.* at 23.

"The doctrine of res judicata, or claim preclusion, will prevent a party from relitigating a legal claim that was or could have been the subject of a previously issued final judgment."   *MACTEC*, 427 F.3d 821, 831 (10th Cir. 2005) (citing *Satsky v. Paramount Communications, Inc.*, 7 F.3d 1464, 1467 (10th Cir. 1993)), *cert. denied*, 547 U.S. 1040 (2006).   Under Tenth Circuit law, claim preclusion applies when three elements exist:   (1) a final judgment on the merits in an earlier action; (2) identity of the parties in the two suits; and (3) identity of the cause of action in both suits.   *See id.* (citing *Wilkes v. Wyo. Dep't of Employment*

---

[3]   The arbitrator's "Final Analysis and Conclusions" did not contain any analysis, make any conclusions, or otherwise address the FMLA.   *See* Arbitration Op. at 20-21.   In the "Discussion" section of the Arbitration Opinion, however, the arbitrator did consider whether the Plaintiff's absences were protected under the FMLA, and the arbitrator determined that "it cannot be shown that Grievant was in any way entitled to protection under the FMLA for the . . . absences in question."   *Id.* at 11.   Because this conclusion regarding the FMLA was not included in the "Final Analysis and Conclusions," it appears that the arbitrator considered the question whether the FMLA protected the Plaintiff's absences as a possible defense to the Defendant's argument that it had just cause for the termination.   In any event, regardless of the context in which the arbitrator reached the decision that the Plaintiff was entitled to FMLA protection, the Defendant argues that the arbitrator's conclusion of law regarding the FMLA precludes the Plaintiff's litigation of his FMLA claim before this Court.

*Div. of Labor Stds.*, 314 F.3d 501, 504 (10th Cir. 2003)).  If these requirements are met, res judicata is appropriate unless the party seeking to avoid preclusion did not have a "full and fair opportunity" to litigate the claim in the prior suit.  *See id.* (citation omitted).[4]   The Tenth Circuit has held that, with respect to the first requirement—*i.e.*, a final judgment on the merits in an earlier action—"[A] valid and final award by arbitration generally has the same effect under the rules of res judicata as a judgment of a court."  *Id.* at 832 (citing *Restatement (Second) of Judgments* § 84(1) & cmt. b (1980)).

The Supreme Court of the United States has determined that adverse arbitral decisions issued pursuant to a collective bargaining agreement will not necessarily preclude an employee's subsequent litigation of his federal statutory claims in a judicial forum.  *See*, *e.g.*, *McDonald v. City of West Branch*, 466 U.S. 284, 292 (1984) (discharged police officer was not precluded by adverse arbitration decision issued pursuant to a collective bargaining agreement from pursuing his Section 1983 claims in federal court); *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728, 745 (1981) (adverse arbitration decision issued pursuant to a collective bargaining agreement did not preclude an employee's claim pursuant to the Fair Labor Standards Act); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) (adverse arbitration decision issued pursuant to a collective bargaining agreement did not preclude an employee's claim pursuant to Title VII of the Civil Rights Act of 1964).   In *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49-50 (1974), the Supreme Court held that a federal court should not bar a claim pursuant to Title VII of the Civil

---

[4]   In a number of Tenth Circuit cases, the court has characterized the "full and fair opportunity to litigate" as a fourth requirement of res judicata.  *See, e.g.*, *Plotner v. AT&T Corp.*, 224 F.3d 1161, 1168 (10th Cir. 2000); *MACTEC*, 427 F.3d at 83 n.6.  The Tenth Circuit, however, has noted that the absence of a full and fair opportunity to litigate is more appropriately treated as an exception to the application of claim preclusion when the three referenced requirements are met.  *See id*.

Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, based upon an arbitration award brought pursuant to a collective bargaining agreement, because an employee's contractual rights under a collective-bargaining agreement—which an employee seeks to vindicate in submitting a grievance to arbitration—are distinct from the employee's statutory rights that an employee seeks to uphold when the employee files a lawsuit under Title VII.  *See id.* at 49-50.  "The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence."  *Id.*  The Supreme Court also noted that a labor arbitrator has authority only to resolve questions of contractual rights to effectuate the intent of the parties and that the arbitrator does not have the "general authority to invoke public laws that conflict with the bargain between the parties."  *See id.*  The Court further expressed concern that in collective-bargaining arbitration brought by a union "the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit."  *Id.* at 58 n.19.  In addition, the Court explained that arbitral factfinding is generally not equivalent to judicial factfinding:  "[t]he record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable."  *Id.* at 57-58.

Similarly, in *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. at 745, the Supreme Court rejected the contention that an arbitration award regarding wage claims precluded a subsequent suit based on the same underlying facts alleging a violation of the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").  *See id.* at 745-46. In holding that the arbitration pursuant to the collective bargaining agreement should not be given preclusive effect, the Court expressed concern that

> even if the employee's claim were meritorious, his union might, without breaching its duty of fair representation, reasonably and in good faith decide not to support the claim vigorously in arbitration.  Wage and hour disputes that are subject to arbitration under a collective-bargaining agreement are invariably processed by unions rather than by individual employees.  Since a union's objective is to maximize overall compensation of its members, not to ensure that each employee receives the best compensation deal available, . . . a union balancing individual and collective interests might validly permit some employees' statutorily granted wage and hour benefits to be sacrificed if an alternative expenditure of resources would result in increased benefits for workers in the bargaining unit as a whole.

*Id.* at 742.   The Court also explained that even when the union has fairly and fully presented the employee's wage claim, the employee's statutory rights might still not be adequately protected, because the "'specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land,'" and many arbitrators may not be conversant with the public law considerations underlying the FLSA.  *Id.* at 743 (quoting *Gardner-Denver*, 415 U.S. at 57).

In *McDonald v. City of West Branch*, the Supreme Court held that a federal court should not give an arbitration award brought pursuant to a collective bargaining agreement res judicata effect in a 42 U.S.C. Section 1983 action, because of the special federal rights that a Section 1983 action is designed to protect.  *See* 466 U.S. at 292; *see also MACTEC*, 427 F.3d at 832.   The Supreme Court relied on its decisions in *Barrentine* and *Gardner-Denver* in so holding.  *See McDonald*, 466 U.S. at 290.

Neither the Supreme Court nor the Tenth Circuit have addressed the preclusive effect of an adverse arbitration opinion on the rights bestowed by the FMLA.   Other courts, however, have considered the issue and have held that the Supreme Court's analysis in *Gardner-Denver* applies.  *See, e.g.*, *Rogers v. N.Y. Univ.*, 220 F.3d 73, 75 (2d Cir.) (applying *Gardner-Denver* to FMLA claims and holding that where a collective bargaining agreement does not specifically make compliance with the FMLA a contractual commitment that is subject to the arbitration clause, the

18

agreement was not sufficiently specific to waive the plaintiff's right to bring an action in federal court based on the same conduct), *cert. denied*, 531 U.S. 1036 (2000); *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 548 (6th Cir. 2008) (holding that an adverse arbitration award does not preclude an employee from pursuing claims based upon rights afforded under the FMLA); *Plumley v. Southern Container, Inc.*, 303 F.3d 364, 373-74 (1st Cir. 2002) (holding that employer was not collaterally estopped, by virtue of prior arbitration award, from disputing the plaintiff's FMLA eligibility); *Joostberns v. United Parcel Service, Inc.*, No. 5:03-CV-108, 2004 WL 3457633, at *3 (W.D. Mich. Oct. 6, 2004) (explaining that "[a]lthough the Sixth Circuit has not, to this Court's knowledge, considered whether the rule expressed in *McDonald* [and] *Gardner-Denver* . . . applies to FMLA claims, several district courts have concluded that it does," the court "finds no reason to disagree with these decisions declining to give preclusive effect in cases involving FMLA claims") (citations omitted); *Cook v. Electrolux Home Prods., Inc.*, 353 F. Supp. 2d 1002 (N.D. Iowa 2005) (holding that res judicata did not bar the plaintiff's FMLA claim in a judicial forum because *Gardner-Denver* applies); *Schtab v. The Greate Bay Hotel & Casino, Inc.*, 173 F. Supp. 2d 255 (D.N.J. 2001) (recognizing that the Supreme Court has not addressed the preclusive effect of an adverse arbitration opinion on the rights bestowed by the FMLA, but that other courts have applied *Gardner-Denver* to FMLA claims, and holding that the arbitration award should not be given preclusive effect pursuant to *Gardner-Denver*); *Slaughter v. Am. Bldg. Maintenance Co.*, 64 F. Supp. 2d 319, 331 (S.D.N.Y. 1999) (holding that collateral estoppel premised on prior adverse arbitral decision did not bar the plaintiff's FMLA claims); *Thoele v. U.S. Postal Serv.*, 996 F. Supp. 818, 821 (N.D. Ill. 1998) (holding that arbitral finding did not preclude litigation of the issue in the plaintiff's subsequent FMLA claim).

19

In a second line of cases, the Supreme Court has addressed the preclusive effect of arbitration awards issued pursuant to individually executed pre-dispute arbitration agreements on federal statutory and constitutional claims.  In these cases—which deal not with arbitration clauses negotiated by unions and embodied in collective bargaining agreements but rather with employees' own agreements to arbitrate specified disputes—the Supreme Court has adopted a more generous view of the extent to which an arbitration award may preclude an employee's litigation of federal statutory and constitutional claims.  Thus, for example, in *Gilmer v. Interstate/Johnson Lane Corporation*, 500 U.S. 20 (1991), and *Green Tree Financial Corporation v. Randolph*, 531 U.S. 79 (2000), the Supreme Court granted motions to compel arbitration with respect to federal employment discrimination claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, respectively.  *See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) (enforcing application of arbitration clause to Sherman Act claims); *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220 (1987) (enforcing application of arbitration clause to Securities Exchange Act and civil RICO claims); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989) (enforcing application of arbitration clause to Securities Act of 1933 claims); *see also Desiderio v. Nat'l Ass'n of Secs. Dealers, Inc.*, 191 F.3d 198, 203-06 (2d Cir. 1999) (enforcing the application of arbitration clauses in individually-executed contracts to claims under Title VII), *cert. denied*, 531 U.S. 1069 (2001).   In *Gilmer*, the Supreme Court distinguished the *Gardner-Denver* line of cases:

> First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims.  Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims.  Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such

> claims, the arbitration in those cases understandably was held not to preclude
> subsequent statutory actions.   Second, because the arbitration in those cases
> occurred in the context of a collective-bargaining agreement, the claimants there
> were represented by their unions in the arbitration proceedings.   An important
> concern therefore was the tension between collective representation and individual
> statutory rights, a concern not applicable to the present case.   Finally, those cases
> were not decided under the FAA, which, as discussed above, reflects a "liberal
> federal policy favoring arbitration agreements."

500 U.S. at 35 (quoting *Mitsubishi*, 473 U.S. at 625).   The Tenth Circuit, citing *Gilmer*, has explained that "the Supreme Court has disavowed *Gardner-Denver*'s anti-arbitration language"—*i.e.*, language that "expressed doubts about the competence of arbitrators to evaluate and decide statutory claims, and about the validity of union-negotiated waivers of employees' federal forum rights for statutory claim"—calling it "misguided, and [has] clarified that an arbitration agreement can constitute an enforceable waiver of judicial forum for statutory civil rights claims regardless whether negotiated individually or collectively."   *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1205 (10th Cir. 2011) (citing *Gilmer*, 500 U.S. at 34 n.5 ("[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution.")).

In *Wright v. Universal Maritime Service Corporation*, 525 U.S. 70, 76 (1998), the Supreme Court confronted the question whether a general arbitration clause in a collective bargaining agreement—which provided for arbitration of "[m]atters under dispute"—was enforceable to preclude an employee from bringing suit under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12010 *et seq.*   The Supreme Court noted that there is "obviously some tension" between the *Gardner-Denver* line of cases denying preclusive effect to collective bargaining arbitrations, on the one hand, and the *Gilmer* line of cases holding individual arbitration

agreements enforceable as against federal statutory and constitutional claims, on the other.  *Id.* at 76-77.  In particular, the Court observed that "[w]hereas *Gardner-Denver* stated that 'an employee's rights under Title VII are not susceptible of prospective waiver,' *Gilmer* held that the right to a federal judicial forum for an ADEA claim could be waived."  *Id.* (quoting *Gardner-Denver*, 415 U.S., at 51-52; *Gilmer*, 500 U.S. at 26).   But the *Wright* Court avoided that issue, ruling that even assuming (but not deciding) that a collective bargaining agreement arbitration clause may be enforceable to compel arbitration of an employee's ADA claims, such a clause would only be enforced where the contract makes "particularly clear" that it intends to cover such claims.  *See id.* at 79.  Specifically, collective bargaining agreement waivers of a statutory right to a judicial forum for claims of employment discrimination, the Court held, "must be clear and unmistakable."  *Id.* at 80.   The Court concluded that the particular collective bargaining agreement arbitration clause at issue in *Wright* that generally provided for arbitration of "[m]atters under dispute" did not make a "clear and unmistakable" statement that it covered claims of employment discrimination.  *Id.* at 81-82.   The Supreme Court therefore found it unnecessary to reach the question whether, upon a clear statement, collective bargaining agreements may validly waive an individual's right to a judicial forum for federal statutory claims.  *See id.* at 77, 82.

The Supreme Court in *14 Penn Plaza v. Pyett*, 556 U.S. 247 (2009), recently reaffirmed the holding of *Gardner-Denver* and answer the question left open in *Wright*.   In *14 Penn Plaza*, the plaintiffs' collective-bargaining agreement contained the following language:

> There shall be no discrimination against any present or future employee by reason of race, creed, color, age, disability, national origin, sex, union membership, or any other characteristic protected by law, including, but not limited to, claims made pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act. . . .   All such claims shall be subject

> to the grievance and arbitration procedures (Article V and VI) as the sole and exclusive remedy for violations.

*Id.* at 252.  Despite the explicit language in the collective bargaining agreement, the *14 Penn Plaza* plaintiffs filed a complaint against their employer in federal court, alleging violations of their statutory rights under the ADEA.  *See id.* at 253-54.  Although the district court and Second Circuit concluded that *Gardner-Denver* controlled, thus rendering the collective-bargaining agreement's waiver of federal forum ineffective, the Supreme Court reversed and held the provision enforceable.  *See id.* at 274.  The Supreme Court explained that *Gardner-Denver* denied preclusive effect to a prior arbitral decision "because the collective-bargaining agreement did not cover statutory claims."  *Id.* at 262.  The Supreme Court emphasized that the *Garnder-Denver* jurisprudence remained sound, but held that the jurisprudence does not "control the outcome where . . . the collective-bargaining agreement's arbitration provision expressly covers both statutory and contractual discrimination claims."  *Id.* at 264.

The Tenth Circuit has recognized that under the Supreme Court's line of cases deciding the preclusive effect of prior arbitral decisions entered in the collective bargaining context the key inquiry is the scope of the arbitration clause.  *See Mathews v. Denver Newspaper Agency LLP*, 649 F.3d at 1205 (identifying "the crucial inquiry [in answering the question whether preclusion applies] is whether the CBA's arbitration provisions covered [the plaintiff's] statutory claims" such that the plaintiff's "prior submission to arbitration . . . constituted a waiver of his right to seek a judicial remedy.").  In *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140 (10th Cir. 2007), the Tenth Circuit held that issue preclusion barred the plaintiff's tort wrongful discharge claim because the arbitration clause in *Lewis* was broad and therefore distinguishable from that in *Gardner-Denver*.  *See id.* at 1148 n.9.  The *Lewis* plaintiff agreed to arbitrate any statutory or tort

23

claims and did not limit the scope of the arbitration to contractual disputes as did the plaintiffs in the *Gardner-Denver* line of cases.   *See id.* at 1143, 1148 n.9.   Thus, the Tenth Circuit gave the arbitral award preclusive effect.   *See id.* at 1148.

In *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d at 1205, the Tenth Circuit again confronted the question whether the scope of an arbitration clause in a collective bargaining agreement barred the plaintiff's subsequent statutory claims under Title VII and 42 U.S.C. Section 1981.   *Id.* at 1206.   The Tenth Circuit held that it was "evident no waiver of judicial forum has occurred" and emphasized that "such a waiver may only occur where the arbitration agreement expressly grants the arbitrator authority to decide statutory claims."   *Id.* (citing *14 Penn Plaza*, 556 U.S. 264; *Wright*, 525 U.S. at 79-80).   In *Matthews*, "[t]he arbitration clause of the CBA, from which the arbitrator derived all authority, state[d] that '[t]he arbitrator shall have no power to add to, subtract from, change or modify any provision of this Agreement, *but shall be authorized only to resolve the dispute submitted to him or her.*'"   *Id.* at 1206-07 (citing the relevant collective bargaining agreement) (emphasis added).   The Tenth Circuit held that the arbitration provision did not grant the arbitrator the authority to decide statutory claims.   *See id.*   The *Matthews* court reasoned:

> The dispute submitted to arbitration by [the plaintiff] asserted a violation of Article II, Section 11 of the CBA and a vague complaint of retaliation, but no statutory claims under Title VII or 42 U.S.C. § 1981.   Because the arbitration agreement empowered the arbitrator to resolve only the dispute submitted, and because the dispute submitted made no mention of statutory claims, the arbitral decision could in no way determine the question of [the plaintiff's] statutory rights.

*Id.* at 1207.   In support of its conclusion that the dispute submitted to the arbitrator did not mention statutory claims, the Tenth Circuit noted,

> the Agency's representative at arbitration agreed that the issue before the arbitrator was whether "the company discriminate[d] against [the plaintiff] *in violation of*

24

>    *Section 11, Article II of the contract*," and the arbitral decision phrased the question
>    decided strictly in terms of [the plaintiff's] contractual rights under the CBA
>    ("[D]id GRIEVANT'S demotion violate the *contractual provisions* prohibiting
>    discrimination?").

*Id.* (emphasis added).   Because the arbitration clause did not cover the plaintiff's statutory claims,

the Tenth Circuit held that pursuant to *Garnder-Denver* "no preclusive effect should be accorded

to the arbitral decision."   *Id.*

Although neither the Supreme Court nor the Tenth Circuit have held that the holdings of

*Gardner-Denver* and its progeny apply to FMLA cases, the Court concludes that the reasoning

supporting these cases applies equally to FMLA cases.   The Supreme Court sought to protect the

federal statutory and constitutional claims under Title VII, the FLSA, and Section 1983 in

*Gardner-Denver*, *Barrentine*, and *McDonald* respectively, reasoning that Congress clearly created

individual federal rights that merited protection.   *Cf. McDonald*, 466 U.S. at 290; *Barrentine*, 450

U.S. at 745; *Gardner-Douglas*, 415 U.S. at 47-48.   The FMLA specifically provides for a private

cause of action "to recover . . . damages or equitable relief . . . in any Federal or State court of

competent jurisdiction."   29 U.S.C. § 2617(a)(2).   The Court concludes that just as Congress

sought to protect rights under Title VII, the FLSA, and Section 1983, Congress likewise created

individual rights under the FMLA that merit protection.   Accordingly, the Court concludes that

the holding of *Gardner-Denver* applies equally to FMLA claims.   *Cf. Rogers*, 220 F.3d 73

(applying *Gardner-Denver* to FMLA claims); *Nance*, 527 F.3d at 548 (same);   *Plumley*, 303 F.3d

at 373-74 (same); *Joostberns*, 2004 WL 3457633, at *3 (same); *Cook*, 353 F. Supp. 2d 1002

(same); *Schtab*, 173 F. Supp. 2d 255 (same); *Slaughter*, 64 F. Supp. 2d at 331 (same); *Thoele*, 996

F. Supp. at 821 (same).

The Court also holds that *Gardner-Denver* prohibits application of the doctrine of res

judicata to the Plaintiff's claims. The facts of this case are analogous to those in *Gardner-Denver*, *Barrentine*, *McDonald*, and *14 Penn Plaza*. The arbitration agreement here, which is contained in a collective bargaining agreement, provides, "The Arbitrator shall be bound strictly by the terms and provisions of this Agreement, and shall have no power to modify, amend or add to the Agreement." Mot. for Summ. J., Exh. 3., CBA, at 18. The Supreme Court, in holding that courts should not give preclusive effect to arbitration awards issued pursuant to collective bargaining agreements, noted that because in this context arbitrators' authority derives solely from the contract, arbitrators may not have the authority to enforce federal statutory or constitutional rights. *See McDonald*, 466 U.S. at 290; *Gardner-Denver*, 415 U.S. at 49-50. Indeed, the arbitrator himself expressed this concern. *See* Tr. at 36:1-3 (arbitrator) ("I think that the board needs to be the one who decides whether something violates a statute."). Because the arbitration provision does not grant the arbitrator authority to decide the FMLA issues, the Court concludes that the facts of this case are analogous to those in *Gardner-Denver* and that the analysis set forth in *Gardner-Denver* is therefore applicable here. The Court therefore denies the Defendant's Motion for Summary Judgment on the ground of res judicata.[5]

---

[5] The Court also declines to give the arbitration award preclusive effect under the doctrine of res judicata because the Court concludes that the Plaintiff did not have a "full and fair opportunity" to litigate the claim in the arbitration. *See MACTEC*, 427 F.3d at 83 (even if a court concludes that there was a final judgment on the merits in an earlier action, an identity of the parties in the two suits, and an identity of the cause of action in both suits, res judicata is not appropriate unless the party seeking to avoid preclusion had a "full and fair opportunity" to litigate the claim in the prior suit). The Plaintiff contends that he did not argue the FMLA issue in his post-arbitration brief, and presumably that he did not advance the argument during the arbitration itself, because during the arbitration the arbitrator expressed skepticism over his ability to resolve the question whether the Plaintiff's absences were protected by the FMLA. *See* Resp. at 22; Tr. at 36:1-3 (arbitrator). The Court finds the Plaintiff's argument persuasive, and therefore declines to give the arbitration award preclusive effect on the additional ground that the Plaintiff did not have a full and fair opportunity to litigate the FMLA claim.

The Court is not persuaded to hold otherwise by the Defendant's argument that the Plaintiff waived his right to a judicial forum for his FMLA claim by raising the FMLA issues in arbitration. *See* Mot. for Summ. J. at 17.   In support of this argument, the Defendant cites the Tenth Circuit's decision in *Mathews v. Denver Newspaper Agency LLP*, and points to the following language in that decision:

> "The dispute submitted to arbitration by [the plaintiff] asserted a violation of Article II, Section 11 of the CBA and a vague complaint of retaliation, but no statutory claims under Title VII or 42 U.S.C. § 1981.  Because the arbitration agreement empowered the arbitrator to resolve only the dispute submitted, and *because the dispute submitted made no mention of statutory claims*, the arbitral decision could in no way determine the question of [the plaintiff's] statutory rights."

Mot. for Summ. J. at 17 (quoting *Matthews*, 649 F.3d at 1207) (emphasis in original).   The Defendant attempts to distinguish *Matthews*:   "In this case, however, the Union raised the FMLA issues in arbitration, arguing that the Plaintiff's absences should be excused because they were covered by the FMLA."  *Id*.   Although the *Matthews* court based its holding that the arbitration clause did not waive the statutory claims on the fact that "the dispute submitted [to the arbitrator] made no mention of statutory claims," the Tenth Circuit grounded its decision on this factor only because the language of the arbitration clause itself provided that "'[t]he arbitrator shall have no power to add to, subtract from, change or modify any provision of this Agreement, *but shall be authorized only to resolve the dispute submitted to him or her.*'"   649 F.3d at 1206-07 (quoting the relevant collective bargaining agreement) (emphasis added).

The Tenth Circuit emphasized that "the crucial inquiry" in answering the question whether the doctrine of preclusion applies is whether the language of the collective bargaining agreement's arbitration provision covers the plaintiff's statutory claims.  *See id.* at 1205.   If the arbitration provision covers statutory claims, then the plaintiff's prior submission of his claims to arbitration

becomes a waiver of his right to seek a judicial remedy and the doctrine of preclusion is available. *See id*.   Because the arbitration itself defined the authority as including "the dispute[s] submitted to him or her," the relevant question became—for purposes of determining the availability of preclusion as an affirmative defense—whether the parties submitted statutory claims to the arbitrator.   *See id*.   The *Matthews* court held that "[t]he dispute submitted to arbitration by [the plaintiff] asserted a violation of Article II, Section 11 of the CBA and a vague complaint of retaliation, but no statutory claims under Title VII or 42 U.S.C. § 1981."   *Id*. at 1207.   The Tenth Circuit further pointed out that

> the Agency's representative at arbitration agreed that the issue before the arbitrator was whether "the company discriminate[d] against [the plaintiff] *in violation of Section 11, Article II of the contract*," and the arbitral decision phrased the question decided strictly in terms of [the plaintiff's] contractual rights under the CBA ("[D]id GRIEVANT'S demotion violate the *contractual provisions* prohibiting discrimination?").

*Id*. (emphasis added).   Thus, because the arbitration clause defined the scope of the arbitrator's authority as coextensive with the matters submitted to him, and the parties did not submit any statutory matters to the arbitrator, the *Matthews* court held that the arbitral decision did not constitute a waiver of the plaintiff's statutory claims that would render the holding of *Gardner-Denver* inapplicable and the doctrine of preclusion available.   *See id*.

The arbitration clause here does not contain the language that prompted the Tenth Circuit's inquiry into whether the parties submitted statutory claims to the arbitrator.   While the arbitration clause in *Matthews* provided, "'[t]he arbitrator shall have no power to add to, subtract from, change or modify any provision of this Agreement, *but shall be authorized only to resolve the dispute submitted to him or her*,'" *id*. at 1206-07 (citing collective bargaining agreement) (emphasis added), the arbitration clause here provides only that "[t]he Arbitrator shall be bound

28

strictly by the terms and provisions of this Agreement, and shall have no power to modify, amend or add to the Agreement" with no additional provision authorizing the arbitrator to resolve disputes submitted to him or her.   *See* Mot. for Summ. J., Exh. 3, CBA at 18.   Thus, while the Tenth Circuit considered the matters submitted to the arbitrator in *Matthews* for the purposes of determining the scope of the arbitration clause and whether the plaintiff waived the right to a judicial forum for his statutory claims, the Court need not—and indeed under the Supreme Court's decision in *Gardner-Denver* and its progeny cannot—define the scope of the arbitration clause by reference to what the parties submitted to the arbitrator.   Rather, the Court must look, as the Tenth Circuit has instructed, to the arbitration clause itself to determine whether the Plaintiff has waived his statutory claims, thereby rendering the doctrine of preclusion available.   *Cf. Matthews*, 649 F.3d at 1205; *14 Penn Plaza*, 556 U.S. at 262, 264 (looking to the collective bargaining agreement to determine whether it covered statutory claims and holding the *Garnder-Denver* jurisprudence does not "control the outcome where . . . the collective-bargaining agreement's arbitration provision expressly covers both statutory and contractual discrimination claims").   The Court already has concluded that the CBA's arbitration clause contains no language that covers both statutory and contractual claims.   Thus, the Court denies the Defendant's Motion for Summary Judgment on the ground of res judicata.

## II.   THE ARBITRATOR'S FINDINGS AND CONCLUSIONS ARE NOT ENTITLED TO GREAT WEIGHT.

The Defendant contends that if the Court does not preclude the Plaintiff's FMLA claim on the ground of res judicata, the Court should give the arbitrator's findings, which the Defendant contends "conclusively demonstrate that the Plaintiff's termination did not violate the FMLA, "great weight."   Mot. for Summ. J. at 15 (citing *Matthews*, 649 F.3d at 1212) (additional citation

omitted).   "In *Gardner-Denver,* the Supreme Court counseled that, when evaluating a plaintiff's statutory discrimination claims arising out of the same facts as a previously arbitrated contract dispute, the arbitrator's prior decision 'may be admitted as evidence and accorded such weight as the court deems appropriate.'"   *Matthews*, 649 F.3d at 1211-12 (quoting *Gardner-Denver*, 415 U.S. at 60).   The Supreme Court "clarified that it could prescribe no fixed standard as to the probative weight accorded to such an arbitral decision, 'since this must be determined in the [trial] court's discretion with regard to the facts and circumstances of each case.'"   *Id.* at 1212 (quoting *Gardner-Denver*, 415 U.S. at 60 n.21) (citing *Barrentine*, 450 U.S. at 743 n.22).   The Tenth Circuit and Supreme Court have held that "'[w]here an arbitral determination gives full consideration to an employee's [statutory] rights, a court may properly accord it great weight,'" but the court must also consider the "'degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators.'"   *Id.* at 1212 (quoting *Gardner-Denver*, 415 U.S. at 60 n.21).

Although the Plaintiff does not directly argue that the Court should decline to apply great weight to the arbitrator's FMLA determination on the ground of procedural fairness, the Plaintiff does point out that, although the Union raised the FMLA issue in its grievance, the arbitrator expressed skepticism that he could resolve the statutory issue.   *See* Resp. at 22; Tr. at 36:1-3 (arbitrator) ("I think that the board needs to be the one who decides whether something violates a statute.").   The Plaintiff contends that because of this skepticism, the Union did not brief the issue in its post-arbitration brief.   *See* Resp. at 22.   The Plaintiff also maintains that the agreed-upon issue before the arbitrator was not whether the FMLA protected the Plaintiff's absences but rather whether the Defendant had just cause to terminate the Plaintiff.   *See id.*; *see also* Arbitration Op. at 3 (the parties agreed that the "Issue" before the arbitrator was limited to whether the Defendant

had "just cause to terminate [the Plaintiff]," and, if not, what the appropriate remedy was for the lack of just cause).

Although the Court may accord an arbitrator's determination "great weight," it may only do so where the arbitral determination gives "full consider to an employee's [statutory] rights," and before according great weight, the Court must also consider the "degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators." *Gardner-Denver*, 415 U.S. at 60 n.21; *accord Matthews*, 649 F.3d at 1212 (quotation omitted).  Because the arbitrator expressed skepticism about his ability to resolve the statutory claims, the Plaintiff declined to fully advance those claims in a post-arbitration brief.  Construing the facts in the Plaintiff's favor, as the Court must on a motion for summary judgment, *see Kaus v. Standard Ins. Co*., 985 F. Supp. 1277, 1281 (D. Kan. 1997), the Court concludes that after hearing the arbitrator express skepticism about his ability to resolve the FMLA issues, the Union did not have incentive to advance the Plaintiff's statutory arguments with vigor, and in fact did not advance the argument in its post-arbitration brief.  The Court therefore concludes that because the Union did not fully assert the Plaintiff's statutory arguments, it would be procedurally unfair of the Court to accord great weight to the arbitrator's FMLA findings.  The Court also notes that the arbitrator could not give "full consideration" to the FMLA issues given that the Union did not fully advocate the Plaintiff's statutory rights pursuant to the FMLA.  The Court therefore does not deem it appropriate to accord great weight to the arbitrator's findings and conclusions with respect to the FMLA.  *Cf. Gardner-Denver*, 415 U.S. at 60 (explaining that the arbitrator's prior decision "may be admitted as evidence and accorded such weight as the court deems appropriate"); *accord Matthews*, 649 F.3d at 1211-12.

III.   **THE ARBITRATOR'S FINDING THAT THE PLAINTIFF VIOLATED THE ATTENDANCE POLICY IS NOT ENTITLED TO PRECLUSIVE EFFECT UNDER THE DOCTRINE OF COLLATERAL ESTOPPEL.**

The Defendant argues that it is entitled to summary judgment on the ground of collateral estoppel, because the "facts found by the arbitrator establish that Plaintiff did not comply with [the Defendant's] Attendance Policy" when he failed to follow the call-in procedures on July 15, 16, and 20, 2010, and that this issue should not be relitigated.   Mot. for Summ. J. at 11; *see also* Arbitration Op. at 13 (the "attendance policy clearly states the manner in which employees are to report absences and tardies," and "[o]n July 15 and 16 Grievant did not contact Mr. Irwin, nor did he call the 24-hour message service to report off" as specified in the Attendance Policy); *id.* at 17 ("The evidence discussed above establishes that Grievant failed to comply with the call-in procedures on July 20").   The Plaintiff does not specifically object to the Defendant's contention that the Court should apply the doctrine of collateral estoppel to bar relitigation of the question whether the Plaintiff violated the Attendance Policy.   Rather, the Plaintiff argues first that the Court should not accord the arbitrator's FMLA findings and conclusions preclusive effect, an issue which the Court already has decided in the Plaintiff's favor, *see supra* § I, and second that a determination that the Plaintiff violated the Attendance Policy is not fatal to the Plaintiff's FMLA claim, an argument which the Court addresses in Sections IV and V, *infra.*

The doctrine of collateral estoppel, also known as issue preclusion, prevents relitigation of an issue decided in a prior action.   *See Spradling v. City of Tulsa*, 198 F.3d 1219, 1222 (10th Cir. 2000).   In order for issue preclusion to apply, a party must show that (1) the issue previously decided is identical with the one presented in the instant action; (2) the prior action was finally adjudicated on the merits; (3) the party against whom estoppel is invoked was a party or in privity with a party in the prior action; and (4) the party against whom estoppel is sought had a full and fair

opportunity to litigate the issue. *See Moss v. Kopp*, 559 F.3d 1155, 1161 (10th Cir. 2009); *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir.), 531 U.S. 825 (2000). "The doctrine of collateral estoppel . . . bars relitigation of legal or factual issues that have previously been decided through arbitration." *Coffey v. Dean Witter Reynolds Inc.*, 961 F.2d 922, 927 n.4 (10th Cir. 1992) (affirming the application of collateral estoppel of an arbitration award resulting from an arbitration ordered by a state court to a case bringing identical claims against the identical defendants in federal court) (citation omitted). "Where, as here, the parties have invested considerable time and resources arbitrating an issue identical to that before the court, and the arbitration panel clearly articulates its findings on that issue, the court may consider this evidence that the parties intended the arbitration to have preclusive effect." *B-S Steel of Kan., Inc. v. Texas Indus., Inc*., 439 F.3d 653, 666 (10th Cir. 2006); *see MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir.) ("As for finality, a valid and final award by arbitration generally has the same effect under the rules of res judicata as a judgment of a court."), *cert. denied*, 547 U.S. 1040 (2006).

Although the Defendant asks the Court—in the event the Court does not preclude the Plaintiff's FMLA claim on the ground of res judicata—to apply the doctrine of collateral estoppel to the arbitrator's finding that the Plaintiff violated the Attendance Policy, the Court declines to do so. The holding of *Gardner-Denver* applies equally to bar application of the doctrine of collateral estoppel as it does to bar the doctrine of res judicata. *See McDonald*, 466 U.S. 284, 292 (1984) ("We therefore hold that in a § 1983 action, a federal court should not afford res judicata or collateral-estoppel to effect an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement"); *Cook v. Electrolux Home Prods., Inc.*, 353 F. Supp. 2d 1002, 1021 (N.D. Iowa 2005) ("For the same reasons that arbitral awards are not accorded a *res judicata* effect, courts have also found that prior arbitral decisions should not be accorded issue preclusive

33

effect" when the arbitral award decides contractual rights pursuant to a collective bargaining agreement) (citations omitted); *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 549 (6th Cir. 2008) (the doctrine of collateral estoppel does not preclude a party from relitigating an issue raised in a prior arbitration over a contractual issue in federal court, because *Garnder-Denver* applies), *cert. denied*, 555 U.S. 1171 (2009).   Thus, for the same reasons that the Court denies the Defendant's Motion for Summary Judgment on the ground that the doctrine of res judicata bars the Plaintiff's FMLS claim, *see supra* § I, the Court also rejects the Defendant's argument that the doctrine of collateral estoppel bars the relitigation of the factual issue whether the Plaintiff violated the Attendance Policy.

That the issue that the Defendant seeks to bar from relitigation—*i.e.*, whether the Plaintiff violated the Defendant's Attendance Policy—is contractual in nature, as distinguished from arbitrator's decision regarding the statutory issue under the FMLA, does not persuade the Court to hold otherwise.   Any attempt by the Court to sever the "just cause" contractual claim for wrongful termination from the statutory FMLA claim provides an "impractical and excessively narrow reading of *Gardner-Denver*."   *Nance*, 527 F.3d at 548 (holding that collateral estoppel does not apply to an action under anti-discrimination statutes where a previous arbitration addresses only contractual issues under a collective bargaining agreement and refusing to attempt to sever the evidence regarding the contractual issues from the statutory issues).   As the United States Court of Appeals for the Sixth Circuit explained, in the context of reversing the district court's decision that attempted to parse the claims, "[t]here is no realistic way to sever the discharge from the claim of discrimination"; rather, because "'just cause' or similar contract questions are an integral part of many discrimination claims, the better rule avoids judicial efforts to separate and classify evidence offered by the plaintiff under the heading of 'discrimination' or 'just cause.'"   *Becton v. Detroit*

34

*Terminal of Consol. Freightways*, 687 F.2d 140, 141-42 (6th Cir.1982), *cert. denied*, 460 U.S.

1040 (1983); *accord Nance*, 527 F.3d at 548 (quoting *Becton*, 687 F.2d at 142).   Furthermore,

"certain facts may have one meaning under a collective bargaining agreement but an entirely

different meaning for the purposes of an antidiscrimination statute, making the 'legal *and* factual

issues raised in [the plaintiff's discrimination] claim . . . beyond the competence of the ordinary

arbitrator whose primary expertise concerns the demands and the norms of industrial relations.'"

*Shaltry v. City of Saginaw*, 2011 WL 252518, at *4 (E.D. Mich. Jan. 20, 2011) (quoting *Nance*,

527 F.3d at 549) (emphasis in original).   Thus, "if a plaintiff does not expressly waive [his] right

to bring claims in federal court, a prior arbitration does not preclude [a court] from reconsidering

*all factual issues* underlying a statutory claim."   *Nance*, 527 F.3d at 549 (emphasis added); *see*

*Shaltry*, 2011 WL 252518, at *5 (holding that "collateral estoppel does not bar Defendant from

re-litigating the *factual and legal issues* determined in the prior arbitration proceeding") (emphasis

added).   The Court therefore denies the Defendant's motion asking the Court to apply the doctrine

of collateral estoppel to the arbitrator's finding that the Plaintiff violated the Defendant's

Attendance Policy.[6]

---

[6]   The Defendant also asks the Court, in the event the Court declines to collaterally estop the
Plaintiff from relitigating the issue whether the Plaintiff violated the Attendance Policy, to give the
arbitrator's decision "great weight."   Mot. for Summ. J. at 14.   As discussed, the Supreme Court
in *Gardner-Denver* held that an arbitral finding "may be admitted as evidence and accorded such
weight as the court deems appropriate."   415 U.S. at 60.   "Ultimately, [however,] the weight of
the evidence is not important for summary judgment purposes; it matters whether plaintiff can
demonstrate the existence of a genuine issue of material fact," which is an inquiry that does not
turn on the weight the Court gives to any particular piece of evidence.   *Romero-Ostolaza v. Ridge*,
370 F. Supp. 2d 139, 147 (D.D.C. 2005).   Because the Court concludes that the Plaintiff has
pointed to evidence generating a question of fact with respect to whether his failure to comply with
the Attendance Policy should be excused, *see infra* § IV, the Court need not—and therefore does
not—determine whether to accord the arbitrator's finding that the Plaintiff violated the Attendance
Policy great weight.

**IV.    A QUESTION OF FACT EXISTS WITH RESPECT TO WHETHER THE PLAINTIFF COMPLIED WITH THE NOTICE PROVISIONS FOR UNFORESEEN LEAVE CONTAINED IN 29 C.F.R. § 825.303.**

Defendant contends that the Plaintiff's FMLA claim must fail because the "Plaintiff did not comply with the notice provisions of [the Defendant's] Attendance Policy, and thus his termination was not prohibited by the FMLA."   Def. San Juan Coal Company's Reply in Support of Mot. for Summ. J. ("Reply") at 8; *see* Mot. for Summ. J. at 9 ("Because Plaintiff failed to comply with his employer's notice policy, as required by the FMLA Regulations, his termination does not violate the FMLA").   Thus, the Defendant maintains that the violation of its internal notice procedures necessarily demonstrates that no FMLA violation occurred.   The Plaintiff disagrees, arguing that even if the Plaintiff violated the Attendance Policy, which the Plaintiff disputes, this lack of compliance does not necessarily violate the FMLA's notice requirements for unforeseen leave.   *See* Resp. at 19 (citing 29 C.F.R. § 825.303).

The FMLA allows a qualified employee to take up to twelve weeks of leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."   29 U.S.C. § 2612(a)(1)(D).   Courts have recognized two theories for recovery on FMLA claims seeking to enforce this right.   *See Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002).   The first "retaliation" or "discrimination" theory is based upon the language in Section 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," 29 U.S.C. § 2615(a)(2), and the second "entitlement" or "interference" theory is based upon the language in Section 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this

subchapter," *id.* § 2615(a)(1); *see Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004).

Under either theory, as a threshold matter, a court must first determine whether an employee provided his or her employer with notice of the employee's need to take FMLA leave. *See, e.g.*, *Bones*, 366 F.3d 869.   In *Bones v. Honeywell International, Inc.*, the Tenth Circuit held that improper notice under the FMLA is an issue which is separate from the analysis of a substantive FMLA interference claim.   *See id.* at 877 n. 2.   The Tenth Circuit did not elaborate who bears the burden of proof regarding notice, *see id.*, and it apparently has not addressed the issue in later cases.   *See Valdivia v. BNSF Ry. Co.*, No. 07-2467-KHV, 2009 WL 352604, at *5 (D. Kan. Feb. 12, 2009).   District courts in the Tenth Circuit are split on the question whether the defendant or the plaintiff bears the burden of proof.   *Compare id.* ("Because Tenth Circuit law on the issue is unclear, the Court gives plaintiff the benefit of the doubt and assumes without deciding that defendant bears the burden of proof on this issue.") *and Henderson v. Whirlpool Corp.*, 17 F. Supp. 2d 1238, 1246 (N.D. Okla. 1998) (improper notice is affirmative defense to FMLA interference claim) *with Allender v. Ratheon Aircraft Co.*, 339 F. Supp. 2d 1196, 1205 (D. Kan. 2004) (plaintiff cannot show right to FMLA leave without proof of adequate notice).   The Court, however, need not decide the question who bears the burden of proof, because in this case it is of no consequence.   Even if the Plaintiff did bear the burden, the Court nonetheless would deny the Motion for Summary Judgment because the Plaintiff has presented evidence that creates a dispute of fact with respect to whether the Plaintiff complied with the FMLA's notice requirements.

The FMLA itself makes no reference to any notice requirement for unforeseen leave.   *See*

*Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d 1192, 1208 (S.D. Cal. 1998).[7]   The Department of

Labor's regulations implementing the FMLA, however, do establish notice requirements for both

"foreseeable" and "unforeseeable" leave.   *See* 29 C.F.R. §§ 825.302 and 825.303.[8]   Section

825.303, which applies to the unforeseeable leave applicable here, provides that

> [w]hen the approximate timing of the need for leave is not foreseeable, an
> employee must provide notice to the employer as soon as practicable under the
> facts and circumstances of the particular case.   It generally should be practicable
> for the employee to provide notice of leave that is unforeseeable within the time
> prescribed by the employer's usual and customary notice requirements applicable
> to such leave.   *See* § 825.303(c).   Notice may be given by the employee's
> spokesperson (e.g., spouse, adult family member, or other responsible party) if the
> employee is unable to do so personally.   For example, if an employee's child has a
> severe asthma attack and the employee takes the child to the emergency room, the
> employee would not be required to leave his or her child in order to report the
> absence while the child is receiving emergency treatment.   However, if the child's
> asthma attack required only the use of an inhaler at home followed by a period of
> rest, the employee would be expected to call the employer promptly after ensuring
> the child has used the inhaler.

29 C.F.R. § 825.303(a).   Section 825.303(c), which discusses compliance with employer policies

in the context of unforeseeable leave, provides that

> [w]hen the need for leave is not foreseeable, an employee must comply with the
> employer's usual and customary notice and procedural requirements for requesting
> leave, absent unusual circumstances.   For example, an employer may require
> employees to call a designated number or a specific individual to request leave.
> However, if an employee requires emergency medical treatment, he or she would
> not be required to follow the call-in procedure until his or her condition is stabilized
> and he or she has access to, and is able to use, a phone.   Similarly, in the case of an

---

[7]   Section 2612(e) of Title 29 of the FMLA sets for the notice requirements for foreseeable leave
but the FMLA contains no notice requirements for unforeseeable leave.   *See Mora*, 16 F. Supp. 2d
at 1208.

[8]   The FMLA authorizes the Department of Labor to prescribe regulations to implement the
FMLA.   *See* 29 U.S.C. § 2654.   The parties do not dispute the validity or applicability of the
regulations.   To the contrary, both parties cite and rely upon the regulations applicable to
unforeseeable leave in support their positions.   *See* Mot. for Summ. J. at 8-9; Resp. at 17.
In *Wilkins v. Packerware Corp.*, No. 06-3400, 2008 WL 63482, *5 (10th Cir. Jan.7, 2008), the
Tenth Circuit assumed without deciding that Section 825.303 was entitled to deference
under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984).

emergency requiring leave because of a FMLA-qualifying reason, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.   If an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied.

*Id.* § 825.303(c).

The Defendant argues that it is entitled to summary judgment in its favor because the Plaintiff did not comply with the notice requirements set forth in Section 825.303 of the Department of Labor's regulations.   The Defendant maintains that the violation of its internal notice procedures necessarily demonstrates that no FMLA violation occurred.   *See* Mot. for Summ. J. at 9; Reply at 7-8.   In support of this argument, the Defendant contends that the "FMLA requires Plaintiff to follow his employer's notification policies in the event of unforeseeable FMLA leave," and cites Section 825.303(c) of the Department of Labor's regulations applicable to the FMLA.

Section 825.303(c) of the regulations, however, states that "an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, *absent unusual circumstances*," and provides the example that in an emergency, the employee would not be required to follow the employer's call-in procedure until the employee is able to use a phone.   *Id.* §825.303(c).   Thus, contrary to the Defendant's assertion, the FMLA regulations do not provide that an employee's failure to comply with his employer's internal policies automatically constitutes a violation of the FMLA's notice requirements.   Rather, the employee only "must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case."   *Id.* § 825.303(a).   Although the regulations provide that "[i]t *generally* should be practicable for the employee to provide notice of leave that is unforeseeable within the

time prescribed by the employer's usual and customary notice requirements applicable to such leave," *id*. § 825.303(a) (emphasis added), they nonetheless contemplate that this presumption applies only "absent unusual circumstances," *id.* § 825.303(c).   Thus, even if the Court were to conclude that the Plaintiff violated the Attendance Policy, the Court nonetheless could determine that the Plaintiff complied with the FMLA's unforeseen leave requirements if "unusual circumstances" were present within the meaning of Section 825.303.   *See id*.

The Court concludes that the Plaintiff has pointed to facts that establish a dispute with respect to whether "unusual circumstances" prevented the Plaintiff from notifying the Defendant of his absences on July 15 and 16, 2010, pursuant to the procedure set forth in the Attendance Policy.   *Cf. Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 162 (2d Cir. 2011) (explaining that the phrase "unusual circumstances" is not defined in the regulations, but whether a plaintiff has demonstrated such circumstances is a question of fact).   The evidence suggests that the Plaintiff developed a "severe, debilitating migraine" that began early in the morning on July 15 and lasted until July 19, 2010.   Arbitration Op., at 15; Tr. at 320:13-23 (Ortega).   The Defendant points to evidence that the Plaintiff failed to present any documentation of his debilitating migraine, such as evidence that he had telephoned one of his doctors to discuss his severe symptoms, and that the Plaintiff had on every occasion prior to July 15, 2010, contacted Irwin to prearrange his absence or advise Irwin of the absence.   *See* Arbitration Op. at 13, 21.   The Court concludes, however, that the Plaintiff has pointed to other evidence sufficient to create a factual dispute with respect to whether "unusual circumstances" were present.   The Plaintiff presented evidence that late in the evening on July 14 or early in the morning on July 15, 2010, the Plaintiff developed a debilitating migraine headache, and that because of his migraine headache he "was unable to basically do anything," that he was "unaware of [his] surroundings and . . . was very debilitated," Tr. at

40

320:13-23 (Ortega), that he was physically unable to walk or talk, *see id.* at 211-12 (Harjala), and that he did not call into work because he was "unable to use the phone," *id.* at 320;13-23 (Ortega). Furthermore, the Plaintiff presented evidence that on July 13, 2010, his physicians altered his medications, and that the side effects of his new medication included potentially "severe . . . increase in the migraines, or inability to walk because the medications could cause the patient to become unbalanced."  Mot. for Summ. J., Exh. 1, Arbitration Op. and Award, at 15.  Thus, although the Plaintiff had prearranged or notified Irwin of his absences due to migraine headaches before July 15, 2010, the Court concludes that, consistent with its obligation to construe the facts in the Plaintiff's favor, a reasonable jury could determine that the change in medication altered the severity of the Plaintiff's migraines such that he could not prearrange or notify Irwin of his July 15 and 16, 2010.   Thus, the Court holds that the evidence identified by the Plaintiff creates a question of fact with respect to whether "unusual circumstances" within the meaning of Section 825.303(c) prevented the Plaintiff from complying with the Defendant's Attendance Policy.[9]

The Court next must determine whether the Plaintiff complied with Section 825.303(a)'s requirement that the Plaintiff notify the Defendant "as soon as practicable under the facts and circumstances."  29 C.F.R. § 825.303(a).  The Defendant does not specifically argue that the

---

[9]   The Court need not decide the question whether the Plaintiff's failure to utilize the Defendant's call-in procedures to report that he would not be coming into work on July 15 and 16, 2010, violated the Defendant's Attendance Policy to conclude that a question of fact exists with respect to whether the Plaintiff complied with the FMLA's notice requirements contained in Section 825.303.   The Court, however, nonetheless concludes that the same evidence that creates a question of fact with respect to whether "unusual circumstances" were present within the meaning of Section 825.303(c) creates a factual dispute with respect to whether the Plaintiff violated the Attendance Policy.   The Attendance Policy provides that "in certain instances it may be impossible for an employee to report off," and that under these circumstances, "[t]he employee will have the right to request reinstatement to their job through the grievance procedure." Attendance Policy § III.A.3.   The Plaintiff has pointed to evidence that raises a question of fact with respect to whether these "certain instances" included the facts and circumstances surrounding the Plaintiff's alleged physical incapacity on July 15 and 16, 2010.

Plaintiff failed to provide notice "as soon as practicable" under the circumstances of his absences on July 15 and 16, 2010, as required by Section 825.303(a), but rather contends generally that the Plaintiff failed to comply with his employer's notice policy by notifying his supervisor Irwin of his July 15 and 16, 2010, absences.  *See* Mot. for Summ. J. at 9.  The Plaintiff maintains that although he did not contact Irwin regarding these absences, he did notify other management personnel of his need to take FMLA leave on July 19, 2010.

The Court concludes that a question of fact exists with respect to whether the Plaintiff's notice on July 19, 2010, complied with Section 825.303(a).  The Plaintiff presented evidence that his migraine headache lasted until July 19, 2010, and that within the first two hours of his workday on July 19, 2010, the Plaintiff provided notice to Dawn Villallobos, the person's office in which the Plaintiff was assigned to work, and Jim Grant, a company manager, of his need to take FMLA leave on July 15 and 16, 2010.  *See* Tr. at 323:11-21, 324:7-13 (Ortega); Arbitration Op. at 17.  A reasonable jury could conclude that—based upon the evidence that the Plaintiff's migraine lasted until July 19, 2010, and that the Plaintiff gave notice of his need to take FMLA leave within the first two hours of returning to work on July 19, 2010—the Plaintiff's notice meets the "as soon as practicable" requirement set forth in Section 825.303(a).  More specifically, construing the facts in the Plaintiff's favor, the Court concludes that a reasonable jury could assume that the Plaintiff's headache subsided on the 19th in sufficiently close temporal proximity to the time he gave his employer notice that same day to constitute notice "as soon as practicable under the facts and circumstances of the [Plaintiff's] case."  *Id.*

To the extent, however, that the Defendant also argues that the Plaintiff's notice did not comply with Section 825.303(c), which contemplates that "an employer may require employees to call . . . a specific individual to request leave," 29 C.F.R. § 825.303(c), because the Plaintiff failed

to notify *Robin Irwin* as soon as practicable of his need for leave on July 15 and 16, 2010, as required by the Defendant's Attendance Policy, the Court concludes that a question of fact exists with respect to whether this omission constitutes a violation of the Defendant's Attendance Policy. Although the Defendant presents evidence that Robin Irwin was the Plaintiff's supervisor, that the Attendance Policy requires "[t]he employee [to] contact the Company utilizing the *Call-In Procedure*," and that the Policy states that "[i]f you are unable to reach your *supervisor* call the 24-hour message service to report off," the Plaintiff presents evidence that supports a finding that the Plaintiff was supervised by management personnel other than Irwin.  For example, the Plaintiff cites evidence that during the relevant time frame the Defendant listed Joseph Yazzie as the Plaintiff's "[s]upervisor."  *See* Resp., Exh. 3, Work Schedule.  The Plaintiff also presents evidence that Dawn Villallobos and Rosalin King directed the Plaintiff's work, *see* Tr. at 88:21-25, 89:1-16 (Jones); *id.* at 323:1-10 (Ortega), and that the Plaintiff received "task instruction from Rosalin King and/or Dawn Villallobos," Resp., Exh. 2; Arbitration Op. at 12.[10]  Furthermore, the Plaintiff also identifies evidence that the Plaintiff reported his absence on July 19, 2010, to Dawn Villallobos, and that this absence was considered excused.  *See* Tr. at 137:9-25 (Irwin).  In addition, the Plaintiff presents evidence that the Defendant did not uniformly or consistently apply the call-in procedure as written.  *See supra* pp. 7-8.  Finally, Irwin himself has testified that the Defendant's call-in procedures, which specify that the call must be placed to the *supervisor*, "[are] not an issue" when an employee is already at work.  Arbitration Op. at 17 ("Mr. Irwin also explained that since Grievant was already at work [on the 19th when he informed Villallobos that

---

[10]  The Plaintiff also argues that the evidence shows that he reported to Jim Grant, but the testimony of Jones, to which the Plaintiff points to support this claim that he reported to Grant, demonstrates only that Grant was a salaried member of management, that Grant is in the Safety Department, and that Grant signed employee time cards.  *See* Tr. at 91:1-23 (Jones).

43

he needed to leave work due to his migraine] the call-in procedure was not an issue.").   The Court concludes that this evidence creates a question of fact with respect to whether the Plaintiff's notification of Villallobos and Grant—instead of Irwin—of his need to take FMLA leave on July 15 and 16, 2010, violated the Defendant's call-in procedure.

The Plaintiff also argues that he complied with the FMLA's notice provisions with respect to his absence on July 20, 2010, by notifying Jim Grant—a company manager—by text message that he would not be coming in for work that day.   *See* Resp. at 17.   The Defendant again argues that the Plaintiff's text message to Grant did not comply with the call-in procedure because Grant was not the Plaintiff's supervisor.   *See* Mot. for Summ. J. at 8.   The Court concludes, however, that the same evidence that supported the Court's finding that a factual dispute exists with respect to whether the Plaintiff's July 19, 2010, notification to Villallobos and Grant of his need to take leave on July 15 and 16, 2010, violated the Attendance Policy, creates a factual dispute with respect to whether a text message to Grant on July 20, 2010, violated the Attendance Policy.[11] The Court further notes that the Plaintiff presented evidence indicating that notice to Grant complied with the intent behind the Attendance Policy, which, the Defendant's general manager testified, is to make sure the supervisor who is physically on site and is managing the operations knows which employees will be absent from work.   *See* Tr. at 88:11-20 (Jones).   The Plaintiff testified that he notified Grant instead of Irwin of his July 20, 2010, absence, because the Plaintiff knew Irwin was out of town and that Grant was on site that day.   *See id.* at 325:3-6 (Ortega).   A

---

[11]   Irwin's testimony that call-in procedure does not apply when the employee notifies his employer of an absence while the employee already is at work is the only piece of that previously-cited evidence which does not support the Court's finding that a factual dispute exists with respect to whether the Plaintiff's text message to Grant on July 20, 2010, complied with the Attendance Policy.   This evidence does not apply with respect to the July 20, 2010, text message to Grant, because the Plaintiff was not at work when he notified Grant of his absence.

reasonable jury could conclude that this notification complies with the spirit—if not the word—of the Attendance Policy.

For the foregoing reasons, the Court concludes that a question of fact exists with respect to whether the Plaintiff has complied with the FMLA's notice requirements for unforeseen leave set forth in Section 825.303 of the Department of Labor's regulations implementing the FMLA.  *See* 29 C.F.R. §825.303(c).  Accordingly, the Court denies the Defendant's Motion for Summary Judgment seeking judgment in the Defendant's favor on the ground that the Plaintiff did not provide the Defendant with adequate notice of his need to take FMLA leave on July 15, 16, and 20, 2010.

## V.    THE DEFENDANT CANNOT AVOID FMLA LIABILITY ON THE GROUND THAT THE PLAINTIFF WAS DISMISSED FOR A REASON UNRELATED TO THE FMLA WHEN THAT REASON IS INCONSISTENT WITH THE FMLA.

The Defendant argues that an employer does not generally violate the FMLA if it terminates an employee for failing to comply with an attendance policy.   In support of this claim, the Defendant cites *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869 (10th Cir. 2004), and *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987 (10th Cir. 2011), for the proposition that a plaintiff's substantive FMLA interference claim fails if a defendant establishes that the plaintiff would have been dismissed regardless of his or her request for FMLA leave.   *See* Reply at 8-9; *accord* Mot. for Summ. J. at 10.   The Plaintiff argues that to the extent that the Attendance Policy conflicts with the FMLA, dismissal based upon a violation of the Policy cannot be used to establish that the Plaintiff would have been terminated even if he had not requested FMLA leave, *see* Resp. at 20-21, and that the authorities cited by the Defendant are distinguishable and do not support judgment in the Defendant's favor, *see id.* at 21-22.

"A plaintiff can prevail under an [interference or] entitlement theory if []he was denied

45

h[is] substantive rights under the FMLA for a reason connected with h[is] FMLA leave." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002).   To prevail on an interference or entitlement theory, the plaintiff must demonstrate: "'(1) that he [or she] was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his [or her] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights.'" *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006) (quoting *Jones v. Den. Pub. Schs.*, 427 F.3d 1315, 1319 (10th Cir. 2005)).   Under this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent, *see Bones*, 366 F.3d at 877 (citing *Smith*, 298 F.3d at 960), and the *McDonnell Douglas* burden-shifting analysis does not apply to interference claims, *see Smith*, 298 F.3d at 963.

The Defendant does not argue in this motion that the Plaintiff has failed to satisfy his prima facie case, but rather contends that it terminated the Plaintiff for failing to comply with its Attendance Policy, and that an employer does not violate the FMLA if it terminates an employee for violating its policies.   *See* Mot. for Summ. J. at 9.   Section 2615(a)(1) is not a strict liability statute.   *See Metzler*, 464 F.3d at 1180 (citing 29 U.S.C. § 2614(a)(3)(B) ("Nothing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."); 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."); *Smith*, 298 F.3d at 960 ("[A]n employee who requests FMLA leave would have no greater protections against his or her employment being terminated for reasons not related to his or her FMLA request than he or she

46

did before submitting the request.")).   Thus, "an employee may be dismissed, preventing her from exercising her statutory right to FMLA leave . . . if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave," *id.* at 961 (citing *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262 (10th Cir. 1998)); *see also Metzler*, 464 F.3d at 1180, because "[a] reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory," *Bones*, 366 F.3d at 877.   The burden to demonstrate that "an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave" is on the employer.   *See Smith*, 298 F.3d at 963; *see also* 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

In support of its argument that the Plaintiff's claim must fail because it dismissed the Plaintiff for a reason unrelated to his taking of FMLA leave, the Defendant cites *Bones v. Honeywell International, Inc.* and *Twigg v. Hawker Beechcraft Corporation*.   *See* Mot. for Summ. J. at 10 (citations omitted).   In *Bones*, the defendant fired the plaintiff, who suffered elbow and stress problems, because she missed three consecutive days of work.   *See* 366 F.3d at 874. The plaintiff had submitted a leave request to the medical department, but the defendant's policy also required that she notify her supervisor, which the plaintiff did not do.   *See id.* at 874.   At the time the plaintiff's supervisor terminated her employment, the supervisor did not know that the plaintiff had requested leave under the FMLA.   *See id.* at 874.   The plaintiff claimed that by firing her for not following company policy, the defendant interfered with her FMLA right to take medical leave.   *See id.* at 877.   The district court granted summary judgment in favor of the defendant, finding that (1) the plaintiff had not given proper notice under the FMLA; and (2) even

if the plaintiff had given proper FMLA notice, the defendant would have dismissed her because she had violated company policy by failing to notify her supervisor in addition to the company medical department. *See id.* The plaintiff appealed only the first ruling, and thus the Tenth Circuit determined that it need not address the notice issue because the district court's alternate ruling would still stand. *See id.* The Tenth Circuit nonetheless concluded that "[e]ven if [the plaintiff] had not waived her appeal of the alternate ground, . . . she would still not prevail on appeal." *Id.*

The Tenth Circuit assumed that the *Bones* plaintiff was entitled to FMLA leave but held that the plaintiff would not prevail on her claim because the defendant "successfully established that [the plaintiff] would have been dismissed regardless of her request for an FMLA leave," and "[a] reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory." *Id.* (citing *Smith*, 298 F.3d at 961 (an indirect causal link between dismissal and an FMLA leave is an inadequate basis for recovery); *Gunnell*, 152 F.3d at 1262 (to withstand summary judgment on an interference theory, an employee's termination must have been related to her request for an FMLA leave)); *accord Twigg*, 659 F.3d at 1009 (explaining that in *Bones* the Tenth Circuit held that the plaintiff's FMLA claim must fail because "'[a] reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory'") (quoting *Bones*, 366 F.3d at 877). The plaintiff's supervisor specifically testified that he dismissed the plaintiff because of her failure to comply with the defendant's absence policy, and that he would have terminated her regardless of her request for a medical leave. *See Bones*, 366 F.3d at 878.

The Tenth Circuit concluded that "[n]o reasonable juror could deduce from the . . . evidence that [the plaintiff's] termination was related to her request for an FMLA leave." *Id*.

48

Rather, the plaintiff "was terminated because she did not comply with [the defendant's] absence policy; she would have been terminated for doing so irrespective of whether or not these absences were related to a requested medical leave."  *Id.* (citing *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1108 (10th Cir. 2002) (no interference if the employee would have been terminated in the absence of the FMLA request or leave)).  The Tenth Circuit reasoned that the plaintiff's "request for an FMLA leave does not shelter her from the obligation, which is the same as that of any other . . . employee, to comply with [the defendant's] employment policies, including its absence policy."  *Id.* (citing *Smith*, 298 F.3d at 960 (an employee who requests an FMLA leave has no greater rights than an employee who does not request such a leave)).

In *Twigg v. Hawker Beechcraft Corporation*, 659 F.3d 987 (10th Cir. 2011), the Tenth Circuit, applying the rule articulated in *Bones*, held that the Plaintiff's "FMLA interference claim [failed] because [the defendant] met its burden of demonstrating that it terminated [the plaintiff] for a reason unrelated to her FMLA leave—namely, her failure to comply with the company's notice-of-absence policy."  *Id.* at 991; *see id.* at 1009.  In *Twigg*, the policy required an employee to report absences to her department and indicated that an employee may be terminated for failure to do so on three consecutive days.  *See id.*  Although the policy created a limited exception to the general notice-of-absence requirement, providing that an employee need not report absences once the employee receives formal notification that a request for FMLA leave has been approved, the policy did not except an employee that has requested, but not yet received, formal approval to take FMLA leave.  *See id.*  In *Twigg*, it was undisputed that the plaintiff never received formal approval of her FMLA leave past April 1, 2008, and that she failed to report her absences on April 2, 3, and 4, 2008.  *See id.*  The *Twigg* court held that these facts were akin to those in *Bones*, and that *Bones* compelled the conclusion that the plaintiff's claim must fail because the defendant

49

demonstrated that it terminated the plaintiff for violating its attendance policy, which constituted a reason unrelated to her FMLA leave. *See id.*

The Court is not persuaded that the Tenth Circuit's opinions in *Bones* or *Twigg* preclude the Plaintiff's FMLA claim on the facts before the Court. *Bones* and *Twigg* are distinguishable because the company attendance policies at issue in those cases did not *conflict* with the regulation implementing the FMLA, *i.e.*, Section 825.303(c). In *Bones*, the attendance policy required that the plaintiff notify her supervisor as well as the medical department of her leave request, *see* 866 F.3d at 874, and in *Twigg*, the policy required the plaintiff to continue to report her absences on a daily basis until the employee received formal notification that the FMLA requested leave was approved, *see* 659 F.3d at 1009. Section 825.303 does not prescribe to whom, or the frequency with which, an employee must report his or her leave. Moreover, the facts in *Bones* and *Twigg* did not indicate that the plaintiffs' physical conditions were such that they were unable to comply with the policies. Because Section 825.303(c) specifically contemplates that an employer may require its employees to comply with its "usual and customary notice and procedure requirements for requesting leave," the dismissals based upon the employer policies at issue in *Bones* and *Twigg*—on the facts before the court—constituted independent reasons unrelated to the taking of FMLA to support dismissal. *Cf. Bones*, 366 F.3d at 877 (holding that the defendant terminated the employee for violating its attendance policy, and that the plaintiff's claim was not viable because "[a] reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory"); *Twigg*, 659 F.3d at 991 (holding that the plaintiff's "FMLA interference claim [failed] because [the defendant] met its burden of demonstrating that it terminated [the plaintiff] for a reason unrelated to her FMLA leave—namely, her failure to comply with the company's notice-of-absence policy").

50

*Bones* and *Twigg* are not applicable on the facts before the Court here, however, because while Section 825.303(c) generally requires compliance with an employer's usual and customary policies, it does not authorize an employer to require its employees to comply with policies that are *inconsistent* with the rights granted to employees in that section.   To the contrary, Section 825.303(c) expressly contemplates that an employee need *not* comply with an employer's policies if "unusual circumstances" are present or if there is an "emergency."   29 C.F.R. § 825.303(c). Section 825.303(c) provides that "an employee must comply with the employer's [policies], *absent unusual circumstances*," that in an "emergency" the employee "would *not* be required to follow [a] call-in procedure until his or her condition is stablilized and he or she has access to, and is able to use, a phone," and that "in the case of an emergency requiring leave because of a FMLA-qualifying reason, written advance notice pursuant to an employer's internal rules and procedures may *not* be required when FMLA leave is involved."   *Id.* (emphasis added).

The Plaintiff has pointed to facts demonstrating that the Defendant's policy, as applied to the circumstances surrounding the Plaintiff's leave, is *inconsistent* with Section 825.303(c), which authorizes noncompliance with an employer's policies in "unusual circumstances."   *Id.*   The Court already has held that a question of fact exists with respect to whether "unusual circumstances" existed that prevented the Plaintiff from complying with the Defendant's Attendance Policy.   *See supra* § IV.   Thus, to the extent the Defendant dismissed the Plaintiff for failing to comply with its Attendance Policy in the presence of those unusual circumstances, that dismissal is inconsistent with the rights granted to the Plaintiff in Section 825.303(c).   Therefore, the holdings of *Bones* and *Twigg*, which address policies that—as applied to the facts surrounding these plaintiffs' dismissals—were *consistent* with Section 825.303(c), do not preclude the Plaintiff's FMLA claim.

51

Having established that *Bones* and *Twigg* are distinguishable and do not necessarily compel the dismissal of the Plaintiff's FMLA claim, the Court next determines whether the Defendant's reason for dismissal—namely, the violation of its Attendance Policy—constitutes a "reason for dismissal that is unrelated to a request for an FMLA leave, [which] will not support recovery under an interference theory." *Bones*, 366 F.3d at 877. The Tenth Circuit specifically noted in *Twigg* that neither the plaintiff in *Bones* nor the plaintiff in *Twigg* "raised any arguments that would call into question the legitimacy of [their employers'] enforcement of [the] notice-of-absence polic[ies] under the circumstances," *Twigg*, 659 F.3d at 1009, or argued that their employers' "enforcement of [the] absence polic[ies] was unlawful for any reason other than the mere fact that . . . absences were protected by the FMLA." *Id.* at 1009 n.13. Rather, the plaintiffs only challenged their employers' enforcement of their attendance policies on the ground that their absences qualified for benefits under the FMLA. *See id.* Thus, the Tenth Circuit explained that these cases "did not require us to consider situations in which an employer might *not* be able to rely on an employee's violation of an absence policy as an unrelated reason for dismissing the employee." *Id.* (providing the examples that if the employer enforced its absence policy in a discriminatory manner by applying it only to employees on FMLA leave or if the employer engaged in conduct that would estop it from enforcing the policy, the employer might not be able to rely upon violation of its attendance policy to support dismissal).

The Plaintiff here challenges the Defendant's enforcement of its Attendance Policy on a ground other than that the Plaintiff's absences were protected by the FMLA. Rather, the Plaintiff also argues that the Policy, as applied by the Defendant to the Plaintiff's absences, is inconsistent with Section 825.303, *see* Resp. at 18-20, and that the Attendance Policy itself is unlawful to the extent that it conflicts with Section 825.303(c). *See* Resp. at 20-21 ("Of course, to the extent that

the Attendance Policy itself violates the FMLA, it cannot be used as a basis for termination")

(citations omitted).[12]   Thus, the question left open in *Bones* and *Twigg* is now squarely before the

Court:   Does reliance upon an attendance policy to support a dismissal when the policy as applied

is inconsistent with Section 825.303(c) constitute a "situation[] in which an employer might *not* be

able to rely on an employee's violation of an absence policy as an unrelated reason for dismissing

the employee"?   *Twigg*, 659 F.3d at 1009 n.13.   The Court answers this question in the

affirmative.

        In *Holmes v. The Boeing Co.*, the plaintiff alleged that the defendant violated the FMLA

when it terminated him after he took leave for failing to comply with the defendant's absence

reporting procedure that required him to speak directly to his supervisor or personnel

representative and to inform one of them of his absence.   *See* No. 98-3056, 1999 WL 9760, *1

---

[12]   With respect to the latter argument, that the Attendance Policy itself violates the FMLA to the extent that it is inconsistent with the FMLA, the Defendant contends that the Court should not consider this argument because the Plaintiff failed to allege that the Policy itself violates the FMLA in the Amended Complaint or Joint Status Report and that this claim cannot be raised for the first time in the Response to the Motion for Summary Judgment.   *See* Reply at 9-10.   In support of this contention, the Defendant cites authorities holding that a non-moving party may not raise a new legal claim for the first time in response to a motion for summary judgment.   *See id.* (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("[l]iberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint"); *Equity Asset Corp. v. B/E Aerospace, Inc.*, 388 F. Supp. 2d 1305, 1309 (D. Kan. 2005) (plaintiff could not assert new cause of action based upon successor liability in response to summary judgment when theory was not included in pretrial order)).   The Plaintiff's argument, however, that the Attendance Policy conflicts with the FMLA regulations and that it cannot be used as a basis for termination because it violates Section 825.303(c), *see* Resp. at 20-21, does not constitute a new cause of action or claim for liability, and thus the authorities cited by the Defendant requiring a plaintiff to plead a cause of action in his complaint do not apply.   Rather, the Plaintiff advances his argument that the Defendant cannot use the Attendance Policy as a basis for termination as a *defense* to the Defendant's argument that its dismissal of the Plaintiff for violation of the Attendance Policy insulates the Defendant from FMLA liability.   Because the Defendant argued that it is entitled to summary judgment on the FMLA claim because it terminated the Plaintiff for a legitimate reason, the Plaintiff is entitled to present argument that the reason was not legitimate.

(10th Cir. Jan. 12, 1999).   On appeal, the plaintiff argued that calling his union steward and the automated line was sufficient notice to the defendant of the need for FMLA leave, because the defendant's reporting requirements violated 29 C.F.R. Section 825.303(a).   *See id.* at *2.   In 1999, at the time the Tenth Circuit decided *Holmes*, Section 825.303(a) provided that an employee should give his/her employer notice of the need for FMLA leave

> "as soon as practicable under the facts and circumstances of the particular case.   It is expected that the employee will give notice . . . within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible.   In the case of a medical emergency requiring leave because of an employee's own serious health condition . . . written advance notice pursuant to an employer's internal rules . . . may not be required when FMLA leave is involved."

*Id.* at *3 (quoting 29 C.F.R. § 825.303(a)).   The Tenth Circuit explained that "*only in emergencies* are an employer's advance written-notice requirements *precluded* by this section," and that "[t]he FMLA does not prohibit an employer from requiring its employees to give notice to specific company supervisors on the day the employee is going to be absent *in a nonemergency situation*, as in this case." *Id.* (emphasis added) (citing 29 U.S.C. § 2614(a)(5) ("[n]othing in this subsection shall be construed to prohibit an employer from requiring an employee on leave under section 2612 of this title to report periodically to the employer on the status and intention of the employee to return to work")).   The *Holmes* court noted that the "[p]laintiff ha[d] not alleged that his physical condition was such that he could not comply with defendant's reasonable notice requirements." *Id.*   Thus, the Tenth Circuit concluded that, because the plaintiff had not alleged facts supporting any emergency or physical inability to comply with the company's notice requirements, the notice policy did not violate Section 825.303 and the district court properly concluded that the defendant's discharge did not violate the FMLA.   *See id.* at *3-4.

The Plaintiff has pointed to facts demonstrating that due to a debilitating migraine

headache the Plaintiff was unable to comply with the Attendance Policy's call-in procedures regarding his July 15 and 16, 2010, absences.  *See supra* § IV.  Thus, unlike the plaintiff in *Holmes*, the Plaintiff here has presented evidence that his physical condition prevented him from complying with the Defendant's notice requirements.  *Cf. Holmes*, 1999 WL 9760, *3 (noting that the "[p]laintiff ha[d] not alleged that his physical condition was such that he could not comply with defendant's reasonable notice requirements").   The Tenth Circuit in *Holmes* specifically recognized that "*in emergencies* . . . an employer's advance written-notice requirements [are] *precluded* by . . . section [825.303]," but held that because the *Holmes* plaintiff had not alleged facts supporting any emergency or physical inability to comply with the company's requirements, the plaintiff's discharge did not violate the FMLA.  *See id.* at *3-4 (emphasis added).   The Plaintiff here has presented evidence that raises a question of fact with respect to whether he physically was unable to comply with the Defendant's policy.   The Court concludes that the *Holmes* court specifically contemplated that under such circumstances "an employer's advance . . . notice requirements [are] precluded by . . . section [825.303]."  *Id.* at *3.   Thus, the Court holds that because the Plaintiff has presented evidence from which a reasonable jury could conclude that the Plaintiff was unable to comply with the Attendance Policy, and the Attendance Policy, therefore, as applied to the Plaintiff, was inconsistent with Section 825.303(c), that the Defendant cannot rely upon the employee's violation of the Policy as a legitimate basis for dismissing the employee.

The Defendant does not dispute that the holding of *Holmes* is instructive here, and, in fact, relies upon *Holmes* in support of its Motion.   The Defendant concedes in its Reply that the "Tenth Circuit rule," as stated in *Holmes v. The Boeing Co.*, *see* Reply at 11, is that "an employee cannot seek FMLA relief in the event of his noncompliance with his employer's specific notice

requirements absent an alleg[ation] that his physical condition was such that he could not comply with the defendant's reasonable notice requirements," *Holmes*, 1999 WL 9760, at *3, and acknowledges that the *Holmes* "holding is consistent with *Bones*, and is directly applicable to this case: 'The FMLA does not prohibit an employer from requiring its employees to give notice to specific company supervisors on the day the employee is going to be absent in a nonemergency situation, as in this case.'" Reply at 11 (quoting *Holmes*, 1999 WL 9760, at *3). The Defendant thus agrees that *Holmes* governs but maintains that *Holmes* merits a finding in its favor because, according to the Defendant, *Holmes* demonstrates that an employer may require an employee to follow its procedures. *See id.* Although the Defendant quotes the language in *Holmes* that "noncompliance with his employer's specific notice requirements precludes FMLA relief absent an alleg[ation] that his physical condition was such that he could not comply with the defendant's reasonable notice requirements," and that the FMLA does not prohibit enforcement of an employer's notice policy "in a nonemergency situation," 1999 WL 9760, at *3, the Defendant fails to address the fact that the Plaintiff has pointed to evidence that supports the application of the exceptions (for an impaired physical condition or an emergency) identified in *Holmes* to the facts of this case. That evidence precludes a finding that the Defendant's termination of the Plaintiff for violation of its Attendance Policy insulates the Defendant from liability under the FMLA.

Other courts have considered the question whether an employer's discharge of an employee based upon a policy inconsistent with Section 825.303(c) can constitute an unrelated reason for dismissing the employee that immunizes the employer from FMLA liability and have held that such a policy cannot serve as a legitimate basis for an employee's termination. In *Millea v. Metro-North Railroad Co*., the plaintiff-employee asked another employee to inform the plaintiff's supervisor of an absence, and the supervisor therefore received timely, although

indirect, notice of the plaintiff's use of FMLA leave.   658 F.3d 154, 160, 162 (2d Cir. 2011).   The Second Circuit explained that the FMLA permitted this indirect notice, and that the employer's policy forbidding indirect notice therefore violated the FMLA.   *See id.*   The Second Circuit acknowledged that "there is no dispute that a company may discipline an employee for violating its internal leave policy as long as that policy is consistent with the law."   *Id.* at 161.   The *Millea* court explained, however, "that, on these facts, [the employer's] internal leave policy [wa]s inconsistent with the FMLA."   *Id.*   Thus, the Second Circuit rejected the employer's argument that its discipline "was justified as a matter of law by [the plaintiff's] failure to comply with [the defendant's] internal leave policy requiring an employee to notify his supervisor *directly* when FMLA leave is taken."   *Id.*

In reaching its decision, the *Millea* court referred to Section 825.303(c) of the regulations implementing the FMLA, and explained that although this Section "generally requires employees to 'comply with the employer's usual and customary notice and procedural requirements for requesting leave,' . . . this requirement is relaxed in 'unusual circumstances' or where the company policy conflicts with the law."   *Id.* (quoting 29 C.F.R. § 825.303(c)).   The court explained that "[t]he regulations implementing the FMLA provide that when an employee's need for FMLA leave is unforeseeable (as [the plaintiff's] was), '[n]otice may be given by the employee's spokesperson . . . if the employee is unable to do so personally.'"   *Id.* (quoting 29 C.F.R. § 825.303(a)).   The Second Circuit held that "[b]ecause this regulation expressly condones indirect notification when the employee is unable to notify directly, [the employer's] policy conflicts with the FMLA and is therefore invalid to the extent it requires direct notification even when the FMLA leave is unforeseen and direct notification is not an option."   *Id.* at 162.

Likewise, in *Mora v. Chem-Tronics, Inc.*, the district court rejected the

57

defendant-employer's argument that the plaintiff was required to inform the defendant of the need for medical leave 30 minutes before the start of a shift, because this policy as applied to the facts surrounding the plaintiff's leave request conflicted with the "as soon as practicable" requirement set forth in Section 825.303(a).   *See* 16 F. Supp. 2d 1198, 1216-17 (S.D. Cal. 1998).   The district court explained that "[t]he FMLA does not specify a particular time limit as to when an employee must call in and request FMLA leave, [but] rather . . . mandates that such notice be 'as soon as practicable.'"   *Id.* at 1216-17.   The Court concluded that the defendant's policy, which required that an employee who will miss work call in 30 minutes before his or her shift begins, conflicts with the FMLA's "as soon as practicable" time frame.   The facts supported a finding that the employee's son, who suffered from an advanced HIV infection and met the case definition for having AIDS, was at home with a "very high fever," could not be left alone, and was extremely ill. *See id.* at 1211-12.   The court explained that the "specific purpose of the Act is to deal with situations such as the one presented in this case—a worker having to . . . deal with emergency family and medical problems," and that "[a] company policy that does not allow for such flexibility nor recognize that in FMLA leave situations it may *not be possible* for an employee to call in one half an hour before a shift begins violates the employee's rights under the Act."   *Id.* at 1218 (emphasis added).

The Court is not persuaded otherwise by the Defendant's argument that *Millea* does not "stand for the proposition that an employer may not require employees who have suffered an FMLA-qualifying event to comply with the employer's attendance policy and absence notification procedures."   Reply at 10.   In support of this contention, the Defendant makes a one-sentence argument that merely quotes the *Millea* court's decision and adds emphasis that was not in the opinion itself.   *See id.*   The Defendant states: "[I]n *Millea v. Metro-North Railroad Co.*, the

58

plaintiff asked another employee to *inform his supervisor* of an absence, the supervisor 'received timely, although indirect, notice of [plaintiff's] use of FMLA leave,' and this indirect notice was permitted by the FMLA, [thus] the employer's policy forbidding it violated the FMLA." *Id.* (quoting *Millea*, 658 F.3d at 160, 162) (internal citation omitted).  The Court assumes that by emphasizing "inform his supervisor" that the Defendant intends to advance the argument that the plaintiff complied with the employer's attendance policy because the supervisor was *informed*, albeit not directly, of the employee's absence.  This argument, however, does not persuade the Court that *Millea* is distinguishable or that *Millea* does not "stand for the proposition that an employer may not require employees who have suffered an FMLA-qualifying event to comply with the employer's attendance policy and absence notification procedures."  Reply at 10.  The *Millea* court held precisely this:  That the employer's notice provision requiring *direct* notice to the supervisor conflicted with the FMLA's provision allowing indirect notice, and that the employer therefore could not enforce its inconsistent notice policy to the extent the employee was not able to notify the employer directly.  *See Millea*, 658 F.3d at 162.

The Court likewise is not persuaded by the Defendant's argument that the Seventh Circuit's decision in *Harrell v. United States Postal Service*, 445 F.3d 913, 927 n.7 (7th Cir. 2006), *cert. denied*, 549 U.S. 1095 (2006), holding that a collective bargaining agreement can impose *stricter* return-to-work restrictions than those otherwise incorporated in the FMLA, mandates a decision in the Defendant's favor.  *See* Reply at 10 n.5.  *Harrell* is distinguishable and does not stand for the proposition that an employer may terminate an employee for violating a company policy that is *inconsistent* with the FMLA.   *Harrell* addressed return-to-work restrictions, not notice, and the FMLA statutory provision governing such restrictions, namely 29 U.S.C. Section 2614, specifically provides that "an employer may have a [return-to-work] certification

requirement, but further provides that 'nothing in this paragraph shall supersede a valid State or local law or a collective bargaining agreement that governs the return to work of such employees.'"  *Harrell*, 445 F.3d at 925 (quoting 29 U.S.C. § 2614).  Because the union and employer had entered into a collective bargaining agreement and that agreement had a return-to-work contractual provision, by virtue of Section 2614, that collective bargaining agreement superseded any FMLA requirements.  *See id.*

Section 825.303, in contrast, contains no similar provision to that in Section 2614 allowing an employer's *inconsistent* notice policies to supersede the requirements in Section 825.303.  To the contrary, Section 825.303 specifically provides that the employer's policies are not enforceable when they conflict with Section 825.303.  *See* 29 C.F.R. § 825.303(c).  Because Section 825.303 does not expressly provide that the employer's policies regarding notice supersede the FMLA or its regulations, the holding of *Harrell* is not applicable here.

The Defendant based its termination of the Plaintiff on the Plaintiff's failure to call in his absences on July 15 and 16, 2010, pursuant to the Defendant's call-in procedures.  The Defendant contends that the Plaintiff's FMLA claim must fail because this reason for dismissal was unrelated to the Plaintiff's request for FMLA leave and that, under *Bones* and *Twigg*, the dismissal therefore precludes the Plaintiff's recovery.  *See Bones*, 366 F.3d at 877 ("[a] reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory").  Because the Defendant's dismissal was premised on the Plaintiff's violation of the Attendance Policy for his July 15 and 16, 2010, absences,[13] and the Court has concluded that a question of fact

---

[13]   The Defendant based the Plaintiff's termination on the Plaintiff's failure to follow the call-in procedures for the Plaintiff's July 15 and 16, 2010, absences, and on the Plaintiff's failure to notify Robin Irwin, instead of Jim Grant, of the Plaintiff's July 20, 2010, absence.  Although the termination was premised on three alleged policy violations, each one of the violations was

exists with respect to whether "unusual circumstances" excused the Plaintiff's noncompliance with the Attendance Policy for the July 15 and 16 absences, the Defendant cannot rely upon the Plaintiff's violation of its Attendance Policy as legitimate reason for his dismissal.  Thus, the Court denies the Defendant's Motion for Summary Judgment on the Plaintiff's FMLA claim.

## CONCLUSION

IT THEREFORE IS ORDERED that Defendant San Juan Coal Company's Motion for Summary Judgment and Supporting Brief, filed February 21, 2013 [Doc. 27], is hereby DENIED.


Dated this 3rd day of October, 2013.


_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

---

necessary to support the dismissal, because under the Attendance Policy termination is authorized only after three infractions.   See Attendance Policy § III.A.2 (explaining that the first infraction receives a verbal warning, the second infraction results in a written warning, and the third infraction results in termination).   Because three infractions were required to result in termination, and the Court has concluded that a factual dispute exists with respect to whether the Attendance Policy as applied to two of the three absences violated Section 825.303(c), see 29 C.F.R. § 825.303(c), the Court need not determine whether the Attendance Policy as applied to the third absence was inconsistent with Section 825.303(c).   Even if the Defendant's disciplinary action for the third absence was not inconsistent, the dismissal—which required three violations—is nonetheless tainted by virtue of the other two infractions.